# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1027

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * Eastern District of Missouri. |
| William E. McKanry, | * |
| | * |
| Appellant. | * |

_____

Submitted: September 22, 2010
Filed: January 10, 2011

_____

Before RILEY, Chief Judge, MELLOY and COLLOTON, Circuit Judges.

_____

RILEY, Chief Judge.

A jury convicted William E. McKanry of conspiring to defraud lenders in violation of 18 U.S.C. § 371, lying to a United States postal worker in violation of 18 U.S.C. § 1001(a)(2), mail fraud in violation of 18 U.S.C. §§ 1341 and 2, and wire fraud in violation of 18 U.S.C. §§ 1343 and 2. The district court[1] sentenced McKanry to 27 months imprisonment. The district court also imposed victims' restitution in the amount of $732,753.47. McKanry appeals his conviction and sentence. We affirm.

_____

[1]The Honorable Charles A. Shaw, United States District Judge for the Eastern District of Missouri.

# I.    BACKGROUND

## A.    Facts[2]

### 1.    Mortgage Fraud Scheme

The government charged McKanry for his participation in the fraudulent sale and financing of twelve residential properties. The scheme involved a conspiracy between members of a sellers group and a buyers group. The sellers group consisted of McKanry and his son, William C. McKanry (Chris), as co-owners of USA Properties, LLC. Chris also owned USA Title, LLC. The buyers group consisted of the named purchaser of the properties, Linda Moses, Moses's sister Paula Williams, her niece Heather Williams, and mortgage broker Paula Enders. Real estate agent Brian Triggs operated as an intermediary between the buyers and sellers groups.

USA Properties sold the twelve properties to Moses in December 2005 and January 2006. In order to obtain financing, the buyers group falsely prepared Moses's mortgage application, overstating Moses's net worth and income. The scheme also involved "dual contracting," which creates a "spread" between the amount of money the seller wants to take away from the deal and the amount of money the lender is willing to provide. The buyers and sellers present a written contract to the lender containing a "sales price" that was artificially inflated over what the buyers and sellers verbally understood to be the "real price."

The excess funds created by the "spread" were distributed to buyers group members by way of payouts at closing, with the mortgage broker Enders taking the largest amount. The buyers group justified these cash payouts on the closing

---

[2]We state the relevant facts "in the light most favorable to the jury's verdicts and accept[] all reasonable inferences in support thereof." United States v. Van Nguyen, 602 F.3d 886, 890 (8th Cir. 2010), cert. denied, ___ U.S. ___, 131 S. Ct. 342 (2010) and ___ U.S. ___, 131 S. Ct. 352 (2010).

documents by falsely including expenses for management or repair and improvement of the properties.

Before each closing, Chris, Enders, and Triggs met to review the figures associated with the sale and determine the amount the sellers group needed to provide for the down payment. Then at closing, one of the sellers group members would provide a cashier's check in Moses's name to use for the down payment. Although the down payment came from the sellers group, the closing documents falsely stated that Moses provided the down payment in order to make the lenders believe Moses was more creditworthy. In reality, Moses could not afford to make the down payments. For each of the twelve transactions, either McKanry or Chris—on behalf of USA Properties—signed the relevant closing documents, which reflected the bogus payouts and inaccurate sourcing of the down payments.

The lenders wired the funds for these transactions to USA Title on the various closing dates. After the closings, USA Title mailed the executed closing documents to the lenders. Because each of the lending institutions was located outside Missouri, the wire transfers and mailings necessarily moved in interstate commerce.

As a result of the scheme, Moses received loans totaling $2,711,400 enabling her to purchase all twelve properties without providing any down payment. Enders received $224,874.74 in bogus payments and her company, Foundation Mortgage, acquired an additional $55,438.00. Heather Williams and Paula Williams received $22,361.55 and $23,294.35, respectively. In exchange for the properties, USA Properties received $2,323,863.09. Of that amount, $1,902,664.81 went towards paying off prior loans on the properties. The remaining $421,198.28 was USA Properties' net take. After the closings, the buyers group was unable to pay the mortgages and the lenders foreclosed on all of the properties.

### 2. Investigation

In 2007, the Federal Bureau of Investigation and the United States Postal Inspector Service investigated these transactions. As part of the investigation, Postal Inspector Jeff Walter interviewed McKanry, who denied making the down payments on behalf of, or in the name of, Moses.

Heather Williams later contacted Inspector Walter regarding a potential meeting she was to have with McKanry. On September 25, 2007, at Inspector Walter's direction, Heather Williams met with McKanry at a coffee shop and secretly recorded the meeting. During their conversation, McKanry explained, "The only way [the investigators] could do anything to us is, if they could prove that I gave [Moses] the down payment . . . . Which maybe once or twice I did it." McKanry also discussed Enders, saying, "I'd blame everything on her, cause they can't prove otherwise." After assuring Heather Williams that she could not get into trouble because she was merely a victim of circumstance, McKanry stated, "I don't think anything's gonna happen to us unless they could go back and say, well, these four deals . . ., you gave the money to [Moses] to close. It's not disclosed here."

## B. Prior Proceedings

In June 2008, a federal grand jury indicted McKanry, his son Chris, and Enders. Chris and Enders entered plea agreements with the government. On July 16, 2009, a superseding indictment was then filed against McKanry. Count 1 charged McKanry under 18 U.S.C. § 371 with conspiracy to commit bank fraud, mail fraud, wire fraud, and making a false statement to a government agent. Count 2 charged McKanry with knowingly and willfully making a materially false, fictitious and fraudulent statement to a United States government agent in violation of 18 U.S.C. § 1001(a)(2). Counts 3 through 21 charged McKanry under 18 U.S.C. §§ 2, 1341, and 1343, as applicable, with mail and wire fraud in association with the sale of nine of the properties.

McKanry's five-day trial began on October 5, 2009. Chris, Enders, Moses, Triggs, and Heather Williams all testified for the government. On October 9, the jury returned a verdict of guilty on nine of the twenty-one counts, including conspiracy, making a materially false statement to a government agent, and seven counts of mail and wire fraud associated with three of the properties.[3] Responding to a special interrogatory, the jury found McKanry conspired with others to commit bank fraud, mail fraud, wire fraud, and making a false statement to a government agent.

Following the verdict, a United States Probation Officer prepared a presentence investigation report (PSR), calculating McKanry's base offense level at 7. The PSR recommended a fourteen-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(H), based on the lenders' actual loss, as well as a two-level increase for obstruction of justice pursuant to U.S.S.G. § 3C1.1. The PSR calculated a total offense level of 23 and a criminal history category of I, resulting in an advisory Guidelines range of 46 to 57 months. The PSR also recommended victims' restitution in the amount of $732,753.47.

McKanry objected to the PSR, challenging the loss calculation, which affected both the § 2B1.1(b)(1) enhancement and the amount of restitution, as well as the § 3C1.1 enhancement for obstruction of justice. On December 22, 2009, the district court overruled McKanry's objections, and sentenced McKanry to 27 months imprisonment, which represented a 19-month downward variance from the bottom of the advisory Guidelines range, and two years supervised release. The court also imposed $732,753.47 in victims' restitution. McKanry appeals both his conviction and sentence.

---

[3]The jury convicted McKanry on Counts 1, 2, and 15-21. The jury acquitted McKanry on Counts 3-14. The mail and wire fraud convictions related to transactions involving three properties: (1) 1812 Wade Court, (2) 612 Forrester Drive, and (3) 11717 Talbott Court. The mail and wire fraud acquittals related to transactions involving six other properties.

## II.    DISCUSSION

### A.    Sufficiency of Evidence

We review sufficiency of evidence challenges de novo and "reverse[] only if no reasonable jury could have found the defendant guilty." United States v. Clay, 618 F.3d 946, 950 (8th Cir. 2010). "Evidence is sufficient to sustain a conviction if, when viewed in the light most favorable to the government, it offers substantial support for the verdict." Id. (quoting United States v. Slaughter, 128 F.3d 623, 627 (8th Cir. 1997)).

#### 1.    Conspiracy

We first consider whether the evidence was sufficient to support McKanry's conviction for conspiring to commit mail, bank and wire fraud and to make a materially false statement to a United States Postal Inspector. In order to convict McKanry of conspiracy, the government needed to prove: "(1) a conspiracy with an illegal purpose existed; (2) [McKanry] knew of the conspiracy; and (3) [McKanry] knowingly joined and participated in the conspiracy." United States v. Price, 542 F.3d 617, 620 (8th Cir. 2008). Where, as in this case, the government alleges a conspiracy to commit multiple crimes, "the charge is sustained by adequate pleadings and proof of conspiracy to commit any one of the offenses." United States v. Wedelstedt, 589 F.2d 339, 342 (8th Cir. 1978) (quoting United States v. James, 528 F.2d 999, 1014 (5th Cir. 1976)).[4]

McKanry does not dispute there was a conspiracy pursuant to which the buyers group agreed to deceive the lenders to obtain financing for the transactions. The

---

[4]The government concedes it failed to prove conspiracy to commit bank fraud at trial because it failed to produce evidence the lenders were federally insured. Therefore, McKanry's conviction will be sustained only if there is sufficient evidence to prove he conspired to commit mail fraud or wire fraud, or to make a materially false statement.

government adequately demonstrated, through the testimony of co-conspirators, that the scheme involved selling the properties at a price lower than the reported contract price. The government also established the scheme involved the sellers group, including McKanry, deceptively providing the down payment money in Moses's name. Finally, the jury heard testimony and observed exhibits showing McKanry knew of and actively participated in the scheme. In light of this evidence, it was reasonable for the jury to convict McKanry of conspiracy to commit mail and wire fraud.

McKanry argues this evidence was insufficient to support his conspiracy conviction because he did not harm or intend to harm the lenders, claiming he was only trying to "expedite the closings." McKanry contends he was unaware, did not intend, and could not foresee that Moses would stop making payments on the loans. McKanry's argument fails because it attempts to isolate his acts—selling the properties below the contract price and providing the down payments—from the remainder of the conspiracy. As discussed above, McKanry participated in a scheme to deceive the lenders on the value of the collateral. The conspirators fraudulently induced the lenders to make loans secured by insufficient collateral. Consequently, the lenders received a greater credit risk and less collateral than represented and expected. Thus, the conspiracy harmed the lenders upon closing, independent of any eventual foreclosures.

We also reject McKanry's argument that the evidence was insufficient because the "use of mail and wire was incidental to the alleged fraud and occurred after the alleged fraud had already been committed." While the use of mail and wire must be "a part of the execution of the fraud," they "need not be an essential element of the scheme," but merely "incident to an essential part of the scheme." Schmuck v. United States, 489 U.S. 705, 710-11 (1989). A mailing or wiring "may be routine or even sent for a legitimate purpose so long as it assists in carrying out the fraud." United States v. Nelson, 988 F.2d 798, 804 (8th Cir. 1993).

-7-

In this case, the lenders' wiring of the funds and USA Title's mailing of the loan documentation carried out the essential purposes of the mortgage fraud. The scheme could not have reached fruition without USA Title mailing the closing documents to the lenders and the lenders wiring the money to fund the transactions. We reject McKanry's contention that the deals were complete prior to USA Title mailing the loan documents because there was adequate evidence the lenders would have unwound the loans had they not received these closing documents.

Finally, we dismiss McKanry's contention that he could not have reasonably foreseen the use of interstate mailing and wiring, because McKanry, an experienced real estate professional, signed documents showing the lender was located outside of Missouri and specifically enumerated "Courier/Overnight Fees" and "Wire Transfer Fee." See United States v. Edelmann, 458 F.3d 791, 811-12 (8th Cir. 2006) (finding interstate mailing was reasonably foreseeable to purchaser fraudulently applying for a home loan because he signed closing documents which specifically enumerated a mailing fee).

The evidence is sufficient to support the jury's verdict as to the conspiracy count.

### 2. Mail and Wire Fraud

McKanry also challenges the sufficiency of evidence supporting his convictions for the seven counts of mail and wire fraud. "To establish mail fraud, the government must prove: '(1) a scheme to defraud by means of material false representations or promises, (2) intent to defraud, (3) reasonable foreseeability that the mail would be used, and (4) [that] the mail was used in furtherance of some essential step in the scheme.'" United States v. Bryant, 606 F.3d 912, 917 (8th Cir. 2010) (alteration in original) (footnote omitted) (quoting United States v. Parker, 364 F.3d 934, 943 (8th Cir. 2004)). The elements of wire fraud are nearly identical except they involve the use of interstate wiring instead of mail. See United States v. Anderson, 570 F.3d

1025, 1030 (8th Cir. 2009) (stating elements of wire fraud); <u>United States v. Redzic</u>, Nos. 08-2418 and 08-3662, 2010 WL 4923272, at *2 (8th Cir. Dec. 6, 2010) (noting the mail and wire fraud statutes are "in pertinent part, identical").

McKanry urges reversal of Counts 15 and 16 related to the sale of the Wade Court property, arguing "[t]here was no evidence" he, or his son Chris, paid the down payment on the property or made misstatements regarding the purchase price. We disagree with McKanry's characterization of the evidence. The evidence shows McKanry provided a $4,930.70 cashier's check in the name of Linda Moses, which check was used for the down payment on the Wade Court property. There was also evidence McKanry signed the Wade Court HUD form at the closing, providing bogus payout amounts of $27,892.10 to Enders and an additional $1,176.41 to Paula Williams. A reasonable jury could infer McKanry, an experienced real estate professional, was aware these bogus payouts were meant to deceive the lenders.

With respect to the Talbott Court and Forrester Drive properties (Counts 17-21), McKanry's contention that "there was no evidence that anything involving these particular properties was mailed or wired" is wrong. The government produced copies of the HUD Settlement Statements, shipping receipts, and wire transfer receipts and instructions demonstrating the sales involved interstate wire transfers and shipments. This evidence is sufficient to support McKanry's convictions under Counts 17-21.

### 3. False Statement

Next, we consider McKanry's challenge to his conviction under Count 2 for knowingly making a materially false statement to a United States Postal Inspector in violation of 18 U.S.C. § 1001(a)(2). "To establish a violation of 18 U.S.C. § 1001, the Government must prove that: '(1) the defendant made a statement; (2) the statement was false, fictitious or fraudulent as the defendant knew; (3) the defendant made the statement knowingly and willfully; (4) the statement was within the jurisdiction of a federal agency; and (5) the statement was material.'" <u>United States</u>

v. Rice, 449 F.3d 887, 892 (8th Cir. 2006) (quoting United States v. Johnson, 937 F.2d 392, 396 (8th Cir. 1991)).

Inspector Walter testified that when he asked McKanry "if he made any down payments for Linda Moses," McKanry said, "No." McKanry's denial was directly contradicted by evidence, including McKanry's recorded admission to Heather Williams, demonstrating McKanry did provide a down payment for Moses. This evidence adequately supports the jury's verdict.

We find no merit in McKanry's assertion that his subsequent attempts to call Inspector Walter in order to correct his previous misstatement makes the evidence insufficient to support a conviction. McKanry does not claim he recanted his prior statement, only that he twice *tried* to correct it by unsuccessfully calling Inspector Walter. Even if we were to recognize a recantation defense under § 1001, such a defense would be inapplicable here. See United States v. Cowden, 677 F.2d 417, 420-21 (8th Cir. 1982) (reversing a § 1001 conviction because the defendant "almost immediately corrected" his false customs declaration with a "true oral statement" and because the customs agent's failure to adhere to agency regulation in conducting the search contributed to the existence of the false statement); but see United States v. Beaver, 515 F.3d 730, 742 (7th Cir. 2008) (explaining "§ 1001 contains no recantation defense"); United States v. Sebaggala, 256 F.3d 59, 64 (1st Cir. 2001) ("[W]e see no basis for writing into [§] 1001 a recantation defense that Congress chose to omit."). McKanry did not recant.

## B.    Sentencing Issues

McKanry challenges his sentence, alleging both procedural error and substantive unreasonableness. Specifically, McKanry contends the district court miscalculated his Guidelines range by (1) improperly calculating the victims' loss, which increased his Guidelines range under U.S.S.G. § 2B1.1(b)(1) and his restitution obligations; and (2) enhancing his base offense level for obstruction of justice under

U.S.S.G. § 3C1.1. McKanry also argues his sentence violates the requirements of 18 U.S.C. § 3553(a).

"In reviewing a sentence, this court 'must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, . . . failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence.'" United States v. Bridges, 569 F.3d 374, 378 (8th Cir. 2009) (quoting Gall v. United States, 552 U.S. 38, 51 (2007)). "If the sentence is procedurally sound, we 'then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard.'" Id.

### 1. Loss Calculation

We first examine McKanry's challenge to the district court's loss calculation, which enhanced the Guidelines range under U.S.S.G. § 2B1.1(b)(1) and his restitution obligations. Because "'the damage wrought by fraud is sometimes difficult to calculate' . . . a district court is charged only with" reasonably estimating the loss using a preponderance of evidence standard. United States v. Parish, 565 F.3d 528, 534 (8th Cir. 2009) (quoting United States v. Agboola, 417 F.3d 860, 870 (8th Cir. 2005)); see also U.S.S.G. § 2B1.1, cmt. n.3(C) ("The court need only make a reasonable estimate of the loss"). We review the district court's loss calculation for clear error and will affirm "unless it is not supported by substantial evidence, was based on an erroneous view of the law, or [we have] a firm conviction that there was a mistake after reviewing the entire record." United States v. Theimer, 557 F.3d 576, 578 (8th Cir. 2009).

The amount of loss by fraud is generally "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt. n.3(A). In this case, the sentencing court accepted the PSR's actual loss calculation of $732,753.47. This amount represented "the

difference between the unpaid principal balance of the twelve mortgages and the subsequent sales price of the properties."

McKanry argues the government failed to prove the loss of $732,753.47 was fully attributable to McKanry, as opposed to normal market conditions, and thus the amount in the PSR was entirely speculative. McKanry suggests the actual loss to the lenders was the result of a faltering housing market, not his misconduct.

We disagree. The sentencing court applied the formula recommended by the Guidelines and utilized by this court. See Parish, 565 F.3d at 535 ("To obtain our loss estimate, we subtract the value of the collateral at the time of sentencing . . . from the amount of the loan proceeds."). "The appropriate test is not whether market factors impacted the amount of loss, but whether the market factors and the resulting loss were reasonably foreseeable." Id.

McKanry knowingly participated in a scheme that made an otherwise unqualified borrower appear more creditworthy and able to purchase twelve properties without providing any down payment. We agree with the government, "it was more than reasonably foreseeable that . . . these twelve deals, which were somehow wildly profitable both to the sellers and buyers in a down real estate market, exposed the lenders to the losses they actually suffered."

We also disagree with McKanry's proposition that the calculation was improperly inflated because it included the loss of all twelve properties. McKanry explains he was only charged for substantive crimes associated with nine of the properties, was convicted for crimes associated with only three of those properties, and there was insufficient evidence to support conviction for one of those three properties. Thus, McKanry claims the loss amount should only reflect the lenders' losses for two of the twelve properties, which he calculates at $78,628.56. Using this

calculation, the enhancement would have been eight instead of fourteen, resulting in a reduced sentencing range of 21 to 27 months and less restitution.

McKanry's argument fails to recognize the distinction between the burden of proof employed at trial and sentencing. Unlike a jury applying a reasonable doubt standard, the district court at sentencing evaluates the facts using a preponderance of evidence standard. See United States v. Tyndall, 521 F.3d 877, 883 (8th Cir. 2008). It is appropriate for the district court to consider facts underlying an acquittal "when those facts appear to be sufficiently reliable [and] the government need not prove such facts beyond a reasonable doubt." United States v. Olderbak, 961 F.2d 756, 765 (8th Cir. 1992); see Tyndall, 521 F.3d at 883 ("[A] district court may use a defendant's relevant conduct in sentencing if it finds by a preponderance of the evidence that the conduct occurred, even if that conduct formed the basis of a criminal charge on which a jury acquitted the defendant."). The district court did not err by basing its loss calculation upon the fraudulent transactions for which McKanry was acquitted or not charged, because a preponderance of evidence supports the conclusion McKanry engaged in conduct furthering the fraud on all twelve properties.

McKanry *was* convicted for his role in a fraudulent conspiracy as to all twelve of the properties. The Guidelines instruct that in the case of a conspiracy, adjustments "shall be determined on the basis of . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B); see United States v. Hayes, 574 F.3d 460, 483-84 (8th Cir. 2009) (affirming the district court's calculation that included loss resulting from reasonably foreseeable acts taken in furtherance of the conspiracy). McKanry was an active participant in the overall scheme to deceive the lenders. His participation began by engaging in dual contracting, and continued with deceptively providing funds for the down payments, signing documents containing statements he knew to be false, and lying to Inspector Walter. We find no error in holding McKanry jointly and severally liable for the actual losses the lenders incurred as a consequence of this conspiracy.

### 2.    Obstruction of Justice Enhancement

McKanry next challenges the district court's assessment of a two-level enhancement under U.S.S.G. § 3C1.1 for obstruction of justice. "The district court's factual findings at sentencing are reviewed for clear error, and the district court's application of the sentencing guidelines to the facts is reviewed *de novo*." United States v. Finck, 407 F.3d 908, 913 (8th Cir. 2005). We show great deference when reviewing the district court's factual findings, reversing only when those findings are insufficient under a preponderance of evidence standard. See United States v. Montes-Medina, 570 F.3d 1052, 1061 (8th Cir. 2009).

The district court applied the enhancement for obstruction of justice, in part, because McKanry made materially false statements to Inspector Walter when he "denied that he assisted [Moses] with any down payments on the properties." Pursuant to the Guidelines, the district court was correct to apply the enhancement for McKanry's obstructive conduct even though McKanry was convicted for that same conduct. See U.S.S.G. § 3C1.1, cmt. n.8 (instructing application of this two-level enhancement where the defendant's conviction for the obstructive conduct is grouped with the underlying conviction); see also United States v. Herr, 202 F.3d 1014, 1018 (8th Cir. 2000) ("[I]mposition of the [§ 3C1.1] adjustment is not an impermissible double counting."). We find no merit in McKanry's claim that the district court impermissibly relied on the probation officer instead of making an independent determination. The district court merely sought input from the probation officer. Nothing indicates the district court did not make its own independent determination in properly concluding § 3C1.1 applied.

McKanry next urges that the government failed to demonstrate Inspector Walter's investigation was in any way obstructed or impeded by McKanry's denial of providing the cashier's checks for the closings. We agree with McKanry that the enhancement applies only when the materially false statement "*significantly*

*obstructed or impeded* the official investigation or prosecution of the instant offense." U.S.S.G. § 3C1.1 cmt. n.4(g) (emphasis added); see <u>Finck</u> 407 F.3d at 913-14 (applying note 4(g)). However, we disagree that McKanry's denial did not so obstruct and impede. The sellers group's handling of the down payments under false pretenses was a key fact in a difficult to prove conspiracy. As McKanry told Heather Williams, "The only way [the investigators] could do anything to us is, if they could prove that I gave [Moses] the down payment." Had McKanry told Inspector Walter the truth about the down payments during their meeting, the investigation and prosecution reasonably would have proceeded more quickly and required less effort. Instead, Inspector Walter needed to use clandestine tactics such as equipping Heather Williams with a recording device in order to prove this material fact. We find no error in the district court's conclusion that McKanry's denial significantly obstructed the investigation and prosecution.

### 3. Procedurally Sound and Substantively Reasonable Sentence

McKanry proposes his sentence "was procedurally and substantively infirm." McKanry contends the "district court did not truly consider 18 U.S.C. § 3553(a)" as evidenced by the district court's "glib" response to McKanry's objections and its failure expressly to mention those factors. Once again, we disagree.

"We do not require the district court to mechanically recite the § 3553(a) factors when, as here, it is clear from the record that the court properly considered those factors." <u>United States v. Lazarski</u>, 560 F.3d 731, 733 (8th Cir. 2009). In imposing McKanry's sentence of 27 months, the district court discussed McKanry's age, his physical condition and medical problems, his lack of prior criminal history, the seriousness of the offense, and various sentencing objectives. The district court explicitly considered the § 3553(a) factors and assessed a 19-month downward variance from the bottom of the 46 to 57 month advisory Guidelines range.

We also reject McKanry's challenge to the substantive reasonableness of the sentence. "[W]here a district court has sentenced a defendant below the advisory guidelines range, 'it is nearly inconceivable that the court abused its discretion in not varying downward still further.'" United States v. Moore, 581 F.3d 681, 684 (8th Cir. 2009) (quoting Lazarski, 560 F.3d at 733).

## III. CONCLUSION

We affirm the jury's verdict and the district court's sentence.

_____