# United States Court of Appeals
### For the Eighth Circuit

_____

No. 13-2670

_____

United States of America

*Plaintiff - Appellee*

v.

Steven Lavell Maxwell

*Defendant - Appellant*

_____

No. 13-2671

_____

United States of America

*Plaintiff - Appellee*

v.

Joel Delano Powell, Jr.

*Defendant - Appellant*

_____

No. 13-2730
_____

United States of America

*Plaintiff - Appellee*

v.

Norman Scott Allen

*Defendant - Appellant*


_____

No. 13-2731
_____

United States of America

*Plaintiff - Appellee*

v.

Frederick Adrianne Hamilton

*Defendant - Appellant*

_____

No. 13-2874
_____

United States of America

*Plaintiff - Appellee*

v.

Desmon Demond Burks

*Defendant - Appellant*


_____

No. 13-2926
_____

United States of America

*Plaintiff - Appellee*

v.

Russell Raymond Royals

*Defendant - Appellant*

_____

No. 13-3432
_____

United States of America

*Plaintiff - Appellee*

v.

Gordon Lamarr Moore

*Defendant - Appellant*


_____

Appeals from United States District Court
for the District of Minnesota - St. Paul
_____

Submitted: October 6, 2014
Filed: February 20, 2015
_____

Before LOKEN, BEAM, and COLLOTON, Circuit Judges.
_____

LOKEN, Circuit Judge.

A January 2012 superseding indictment charged twelve defendants with conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1344 & 1349. Various defendants were charged in thirty-seven other counts with specific bank fraud and aggravated identity theft offenses. See 18 U.S.C. § 1028A. Steven Maxwell was charged in Count 39 with conspiracy to commit concealment money laundering.

Eight defendants pleaded guilty, including Maxwell and Russell Royals, who then testified for the government at the trial of Desmon Burks, Joel Powell, Jr., Norman Allen, and Frederick Hamilton. A jury convicted the four of the conspiracy charge and most of the substantive counts. Burks, Powell, Allen, and Hamilton appeal their convictions and sentences. Maxwell and Royals appeal their sentences. After a separate trial in 2013, a different jury convicted Gordon Lamarr Moore of conspiracy to commit bank fraud and aggravated identity theft. Moore appeals the denial of his pretrial motion to suppress. We consolidated the seven appeals and now affirm the district court's[1] seven judgments.

## I. Sufficiency of the Evidence

Count 1 of the Superseding Indictment charged all defendants with executing, by various means, "a scheme and artifice to defraud businesses and [named] Financial Institutions, and to obtain by means of materially false and fraudulent pretenses and representations, monies and funds . . . of the Financial Institutions," in violation of 18 U.S.C. § 1344. This alleged violations of both § 1344(1) and § 1344(2). Counts 2-21 charged one or more defendants with committing specific fraudulent transactions at named Financial Institutions "to execute the scheme and artifice" to defraud. Counts 22-34 charged one or more defendants with committing aggravated identity theft by unlawfully using another person's identification in specific transactions to obtain the assets of named Financial Institutions "during and in relation to" the bank fraud felony. Each count alleged that defendants in committing the offenses were "aided and abetted by each other and by other persons known and unknown" in violation of 18 U.S.C. § 2.

---

[1]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

Burks, Powell, Allen, and Hamilton argue the evidence at trial was insufficient to convict them of these offenses. "We review de novo the sufficiency of the evidence and view that evidence in the light most favorable to the verdict, giving it the benefit of all reasonable inferences" and reversing only if no reasonable jury could find the defendants guilty beyond a reasonable doubt. United States v. Honarvar, 477 F.3d 999, 1000 (8th Cir. 2007).

## A. Count 1: The Conspiracy

At trial, the government introduced testimony by participants in the conspiracy, law enforcement investigators, and bank employees as well as extensive documentary exhibits. The evidence established that the conspiracy as alleged involved various participants -- leaders, recruiters, information providers, and fraudulent check cashers. Participants changed over time as some went to prison and others were recruited. Leader Steven Maxwell testified that he and Russell Royals began using printing equipment to create counterfeit identification documents as early as 2006. After the printing operation was raided by the police, Maxwell began altering checks so they would be accepted at retailers, such as Wal-Mart, which used a check verification system called TeleCheck. The altered checks, supported by stolen or forged identifications, were used at retailers to purchase merchandise, which was then returned for cash. The conspirators shared information on how to avoid retailers' check verification systems, such as driver license numbers that would not trigger a TeleCheck rejection. By using documents issued as temporary licenses, conspirators could use a single license number to support multiple fraudulent transactions. Maxwell also printed checks using a laptop and a portable printer, using a computer program called VersaCheck.

Moore, nicknamed "Lucky," supplied conspirators counterfeit identifications along with checks. After Lucky's operation was raided, Maxwell purchased his own card printer to make fraudulent identifications by printing the picture and signature

of a conspirator, and the name, date of birth, and license number of a victim, on blank card stock. Kevin Martin testified that he created and supplied some of the identifications used.

The conspirators obtained personal information contained in the fraudulent identifications and checks from many sources. Insiders at multiple banks supplied account numbers, addresses, dates of birth, and Social Security numbers. A credit department employee at Target provided personal information, including dates of birth and Social Security numbers. The conspirators purchased stolen checks acquired in auto thefts or supplied by Maxwell's contact at a paper shredding company. They purchased personal information acquired by theft, including stolen employment applications, and information wrongfully supplied by an employee at the Board of Psychology. Maxwell used a website called PublicData.com to verify personal information and obtain driver license numbers. Conspirators conducted over six thousand searches using PublicData.com. Some conspirators used real identifications of persons they resembled.

The conspirators used the stolen and counterfeit documents to unlawfully obtain cash in a variety of ways. A conspirator carrying stolen or counterfeit checks and identification documents would make a bank deposit to learn the account balance, then make a withdrawal for less than the account's full balance, a fraud tactic described at trial as "split deposits." Conspirators shared information regarding banks where it was easier or more difficult to pass counterfeit or fraudulent checks. At some banks, conspirators used real checks they had acquired, rather than fabricated checks.

The conspiracy focused on retail stores during the holiday season, when it was easier to pass checks. Banks typically required more information than retailers, such as a date of birth and Social Security number. Conspirators would alter receipts to circumvent a retailer's waiting period between paying with a check and returning the fraudulently purchased merchandise for cash. A conspirator who had trouble passing

a check would sometimes use his own identification and a check bearing his name, but with a false account number. Kevin Martin testified that he obtained fraudulent checks from Maxwell and Lucky and used the checks to buy expensive items at Wal-Mart and return them for cash. The specific locations where conspirators passed checks -- either banks or retailers -- depended on the information at hand. After Wal-Mart changed its check and return system, the conspirators targeted Sam's Club, which did not require using a check with an actual account number.

There was evidence that Kevin Martin and Maxwell's brother, Desmon Burks, traveled throughout Minnesota and into North Dakota to cash counterfeit checks that Burks supplied. Records were introduced showing that Burks sent Maxwell victim identification information that was used to conduct fraudulent retail transactions. In at least one instance, a counterfeit check passed at a retailer went through the victim's account, giving rise to one count of bank fraud against Burks. Burks recruited check cashers and supplied identification information, fraudulent checks, and instructions on how to conduct the transactions.

Maxwell testified that he made identifications for Powell using stolen personal information. Powell instructed conspiracy participants how to make split deposits. He provided checks to cashers and retained some of the proceeds. At Maxwell's request, Powell recruited a woman whose photograph was placed on a counterfeit identification along with personal information wrongfully acquired from the Board of Psychology. Powell, Maxwell, and two others then went to a bank where the woman cashed a fraudulent check.

Allen was a director of a company named Even Cash Flow ("ECF"). Powell, accompanied by Allen, attempted to open an ECF bank account. When the bank did not permit Powell to be a signer because his identity could not be verified, Allen opened the account. Allen opened ECF accounts with minimal balances at three different banks and used the accounts to deposit substantial checks and receive a

portion of the deposits in cash withdrawals. A bank compliance officer testified that a series of split deposits on the ECF accounts in September and October 2010 involved checks made out to Allen and bearing a "Norman Allen" signature and generated negative balances of thousands of dollars on the ECF accounts. Another branch manager also testified to these transactions, which he said resembled a check kiting scheme. ECF bank records confirmed that some fraudulent deposits took place on the same day, and that the cash received in the split deposits was well in excess of the available funds in the account. Approximately $195,000 of fraudulent checks were passed on the ECF accounts, including some $170,000 after the accounts were closed. Allen and Powell, who exchanged over 1300 phone calls during the course of the ECF transactions, also used the accounts to provide conspirators with checks to open other bank accounts.

Hamilton recruited at least one check casher, accompanied Powell on trips to banks, and provided some of the counterfeit checks. Hamilton and Powell had over four thousand phone calls during the course of the conspiracy.

The evidence presented at trial, which we have briefly summarized, was sufficient to establish the knowing participation of Burks, Powell, Allen, and Hamilton in the bank fraud conspiracy charged in Count 1. Burks argues there was insufficient evidence that he knowingly joined a conspiracy to commit bank fraud because "his planning and his scheming was to get money from Wal-Mart, not a federally insured bank." We disagree. The district court instructed the jury that intent to defraud a financial institution was an element of the offense, and the jury could reasonably infer that Burks intended to obtain the property of a financial institution by means of false pretenses, a violation of 18 U.S.C. § 1344(2).[2]

---

[2]The Supreme Court recently ruled that a violation of § 1344(2), unlike a violation of § 1344(1), does not require proof of intent to defraud a bank. Loughrin v. United States, 134 S. Ct. 2384, 2393 (2014). That ruling does not affect this case because the district court instructed the jury that intent to defraud a financial

Powell argues the district court erred when it refused to give a requested multiple conspiracy instruction. Allen and Hamilton argue there was a fatal variance between the single conspiracy charged and the multiple conspiracies proved at trial. Because the evidence supported a single conspiracy, there was no abuse of discretion in denying Powell's requested instruction and no variance between the indictment and the proof at trial. "If the evidence supports a single conspiracy, the failure to give a multiple conspiracy instruction is not reversible error." United States v. Santisteban, 501 F.3d 873, 881 (8th Cir. 2007) (quotation omitted).

Powell further argues the evidence was insufficient because three government witnesses were government agents with whom one cannot illegally conspire. This contention is without merit. The district court specifically instructed the jury, "There can be no indictable conspiracy involving only the defendant and Government agents and informants." There was more than sufficient evidence that Powell agreed with Maxwell and other non-government conspirators to commit bank fraud.

Allen argues that Vinicia Williamson was the only government witness connecting him to the conspiracy, and his acquittal on two substantive counts in which Williamson was a key participant in the underlying transactions established that the jury discredited her testimony, making the evidence insufficient to convict Allen of conspiracy and another substantive count. We do not agree that, in reviewing a jury verdict, we must completely disregard the testimony of a witness if the jury disregarded part of that witness's testimony. That is inconsistent with our deferential standard in reviewing jury verdicts. See United States v. Clark, 668 F.3d 568, 573 (8th Cir. 2012). But in any event, Allen's actions in opening and maintaining ECF bank accounts through which $195,000 of fraudulent checks passed over a substantial

---

institution was an element of both § 1344 offenses. See United States v. Staples, 435 F.3d 860, 866 (8th Cir.), cert. denied, 549 U.S. 862 (2006). However, Loughrin may affect how § 1344 offenses should be charged and instructed in future cases.

period of time was sufficient additional evidence for the jury to find beyond a reasonable doubt that he was a knowing member of the bank fraud conspiracy.

Hamilton argues that the evidence was insufficient because it was based upon unreliable testimony by cooperating witnesses. "We have repeatedly upheld jury verdicts based solely on the testimony of conspirators and cooperating witnesses, noting that it is within the province of the jury to make credibility assessments and resolve conflicting testimony." United States v. Buckley, 525 F.3d 629, 632 (8th Cir.), cert. denied, 555 U.S. 977 (2008).

## B. The Substantive Counts

Burks was convicted of two counts of aiding and abetting bank fraud for causing the passing of counterfeit checks from victim F.J.'s[3] account in March 2009 and from victim B.H.'s account in October 2008. The check cashers testified that Burks supplied them with fraudulent checks and drove them on check cashing trips. The evidence established Burks's extensive participation in the conspiracy, including supplying identification information and fraudulent checks, some of which went through the victims' bank accounts. The government introduced evidence that Burks conducted a fraudulent deposit and withdrawal at a US Bank in 2010, employing the same technique used by others in the conspiracy. The evidence was sufficient to permit the jury to infer the intent to defraud banks that Burks claims is lacking.

Burks further argues the district court abused its discretion in admitting evidence of a state court conviction for theft by swindle. See United States v. Mihm, 13 F.3d 1200, 1205 (8th Cir. 1994) (standard of review). We disagree. The district court admitted the evidence as relevant to the charged conspiracy. The jury could reasonably find that the US Bank transaction was in furtherance of the charged

---

[3]We use initials to protect the privacy of the victims.

-11-

conspiracy because it occurred within the same time frame, used similar means, and operated in a similar location as the conspiracy. Burks admitted in a pre-trial motion that the conviction was for "acts amounting to fraud on the same banks elicited in Count 1 of the indictment and . . . constituting overt acts in the charged conspiracy."

Powell argues the evidence was insufficient to convict him of five counts of aiding and abetting aggravated identity theft. We disagree. Two counts charged Powell with unauthorized use of victims W.B.D.'s and M.W.'s identifications to deposit a counterfeit check and withdraw money on August 27, 2010. The government presented documentary and testimonial evidence that Powell provided another conspirator with the victims' identifications to conduct the transactions. Two other counts related to the use of victims U.C.'s and R.R.'s identifications for deposits and withdrawals on May 6, 2011. Again, documentary evidence supported trial testimony that Powell provided a conspirator with the means of identification and instructions for completing these transactions. The final count alleged unlawful use of victim K.S.'s identification to attempt a deposit by check on May 24, 2011. Again, documentary evidence and testimony supported this charge.

Allen argues the evidence was insufficient to convict him of the bank fraud charged in Count 20 of the Superseding Indictment -- depositing a $3000 check fraudulently drawn on an ECF account into his own account on September 10, 2010. He concedes the evidence established that he deposited the check despite insufficient funds in the ECF account, as alleged in Count 20. However, he argues, the verdict form required the jury to find that he aided and abetted bank fraud, but the evidence showed no one else was involved in the transaction and therefore he could only be found guilty of liability as a principal.

We need not take up this novel legal issue -- is a conviction vulnerable if the verdict form stated a more restrictive form of liability than the indictment and jury instructions -- because the verdict form in this case contained no such inconsistency.

-12-

The Superseding Indictment charged that "the defendants . . . aided and abetted by each other and by other persons . . . did knowingly" commit each substantive offense to execute a scheme to defraud Financial Institutions, citing 18 U.S.C. § 1344 & 2. This charged Allen in Count 20 with both principal and aiding and abetting liability. The district court's jury instructions likewise included both kinds of liability. The verdict form then incorporated this dual charge by reference: "We, the jury, find the defendant Norman Scott Allen <u>guilty</u> (guilty/not guilty) of the crime of Aiding and Abetting Bank Fraud, *as charged in Count 20 of the Superseding Indictment.*" (Emphasis added.) As the trial evidence was clearly sufficient to find Allen guilty as a principal of the bank fraud offense charged in Count 20, the verdict must be upheld.

The jury convicted Hamilton of committing two substantive bank fraud offenses on January 20, 2010: causing the deposit of a fraudulent check from Hamilton's account into victim V.W.'s account, and causing the withdrawal of $1000 of that fraudulent check. While Hamilton was not present for the transaction, he had past dealings with the conspirator who deposited the check, Hamilton's name appeared on the check, and he had at least five phone calls with Powell that day, including one while the split deposit was occurring. This was sufficient evidence to sustain the conviction for aiding and abetting the bank fraud alleged.

## II. A Jury Instruction Issue

Powell and Allen argue that the district court committed plain error in giving Jury Instruction No. 22, which stated:

> You need not find that all of the theories charged in Counts 1, 4 through 11, 18, 20 and 21 of the Superseding Indictment are proven. Instead, you must find unanimously and beyond a reasonable doubt that at least one of the theories set out in Counts 1, 4 through 11, 18 20, and 21 of the Superseding Indictment is proven.

-13-

The government proposed this instruction at the instruction conference, explaining that it was needed because, while each of these counts charged violations of 18 U.S.C. §§ 1344(1) and 1344(2) in the conjunctive, the government could prove violations in the disjunctive (either/or) so long as the jury found, unanimously, that one theory was proved. After a discussion off the record, the district court stated that counsel for Burks agreed with the proposal. No other defense counsel objected.

On appeal, Powell argues Instruction 22 was plain error because it allowed the jury "to pick any of the twelve counts contained in the instruction to find guilt rather than find guilt as to all counts of the indictment." Phrasing the same contention somewhat differently, Allen argues that "Instruction 22 directed the jury to return at least one guilty verdict against Allen." The colloquy at the instruction conference made clear that this was not the intent of Instruction 22. Nor is it reasonable to conclude that the jury interpreted the instruction as Powell and Allen allege. The district court explicitly instructed the jury that it "must consider separately each crime charged against each individual defendant, and must return a separate verdict for each of those crimes charged." Thus, there was no plain error. Cf. United States v. James, 172 F.3d 588, 593 (8th Cir. 1999) ("that an instruction could conceivably permit a jury to reach a non-unanimous verdict is not sufficient to require reversal when the jury has been instructed that it must reach a unanimous verdict").

### III. Moore's Appeal

The evidence at the second trial established that Moore was involved in the widespread bank fraud conspiracy for many years, making false identification documents and distributing them to other conspirators, recruiting check cashers and traveling with them to conduct fraudulent retail transactions, and recruiting a Board of Psychology employee to copy checks submitted to pay annual licensing fees. Moore was convicted of conspiracy to commit bank fraud and aggravated identity theft and sentenced to 300 months in prison. The issues he raises on appeal relate to

-14-

the denial of his motion to suppress evidence seized during a May 2009 warrant search of an apartment in Inver Grove Heights, Minnesota.

The affidavit supporting the warrant application stated:

Your affiant, Thomas Steffen, has been a police officer for the City of W St Paul for more than twenty years and has conducted numerous search warrants in which evidence has been obtained and used in successful prosecutions.

In March 2009 John Curtis Clark . . . was arrested for commit[t]ing numerous thefts from person[s]. Clark, during an interview, said he usually sold the wallets he stole to someone named "Lucky." Clark said Lucky would take these wallets and using items he found in the wallets, would make identification bearing the wallet owners names. Clark said Lucky lives in an apartment complex, on the second floor, on Ashley Ln in Inver Grove Hts, near Best Buy. Clark said Lucky drove a new looking, black Yukon.
Only one black Yukon was found parked in the apartment complex. The license plate on this vehicle was VXX017. Through investigation, and another interview with Clark, "Lucky" was identified as Gordon Lamarr Moore . . . living at 4895 Ashley Ln #234, and the owner of the black Yukon.

Based on the foregoing information, your affiant requests authorization to search . . . the entire premises . . . at 4895 Ashley Ln #234 Inver Grove Hts MN.

Prior to trial, Moore moved to suppress evidence seized during the warrant search. At the start of the suppression hearing, the government advised that it would contest Moore's Fourth Amendment standing to challenge the search at Apartment 234. The government then presented testimony by affiant Thomas Steffen to show that, "should [the court] decide at a later time that there's not sufficient probable cause

-15-

on the four corners" of the warrant affidavit, the warrant search "would be saved under the Leon good faith exception."

During cross examination of Steffen, questioning by defense counsel and by the magistrate judge established that Clark did not identify Moore as "Lucky," that Clark did not identify Moore's address as 4895 Ashley Lane, Apt. 234, and that Moore was not the registered owner of the black Yukon. Moore introduced no evidence addressing the issue of Fourth Amendment standing. The magistrate judge issued a Report and Recommendation that the motion to suppress evidence seized pursuant to the warrant search be granted "under Franks v. Delaware," 438 U.S. 154 (1978), because three false statements in the warrant affidavit were made with reckless disregard for the truth and, with those statements redacted from the affidavit, "there are no facts upon which an issuing judge could conclude that it was more probable than not that this particular apartment . . . would contain evidence of a crime." Moore had Fourth Amendment standing to challenge the warrant search, the magistrate judge concluded, because "the affidavit in support of the search warrant states that Defendant Moore 'li[ves] at 4895 Ashley Lane #234.'"

The government urged the district court to reject this Recommendation, both on the merits and because Moore lacked Fourth Amendment standing. The district court denied the motion to suppress. Although "infirmities" in the affidavit supported a conclusion that the search was of "questionable constitutional validity," the court determined that Moore "failed to meet his burden of establishing his privacy interest in the apartment," because he relied solely on the warrant affidavit. "[T]he affidavit is of dubious veracity, which limits its use for this purpose. Moreover, the record ... does nothing to tie Moore to the apartment." Moore moved to reopen the record to bolster his claim of Fourth Amendment standing. The district court denied that motion. At trial, the government introduced items seized from the apartment connecting Moore to criminal activity.

-16-

On appeal, Moore argues the district court erred in denying his motion to suppress under Franks v. Delaware. At the outset, we note that the magistrate judge's Recommendation was procedurally flawed:

> When a search warrant is based upon an affidavit setting forth a facially sufficient showing of probable cause, as in this case, the defendant is nonetheless entitled to an evidentiary suppression hearing if he makes a "substantial preliminary showing" that a false statement necessary to the finding of probable cause was "knowingly and intentionally, or with reckless disregard for the truth," included in the warrant affidavit.

United States v. Freeman, 625 F.3d 1049, 1050 (8th Cir. 2010), quoting Franks, 438 U.S. at 155. A "Franks hearing" is what the Fourth Amendment requires. A full evidentiary hearing is essential to determine whether the government can show that the affidavit did not contain false statements, or that any false statements were not necessary to the showing of probable cause, or were not made intentionally or with reckless disregard for the truth, as the government established in Freeman, 625 F.3d at 1052.

Here, Moore did not request a Franks hearing in his motion to suppress. Thus, if errors in the warrant affidavit were exposed during cross examination of Officer Steffen at the suppression hearing, Moore should have moved for a Franks hearing. If the magistrate judge determined that the cross examination had established the "substantial preliminary showing" that Franks and our prior cases require, a full evidentiary Franks hearing should then have been ordered. Only at the conclusion of that hearing could the magistrate judge appropriately have made the ultimate Franks determinations of recklessly false statements on which the finding of probable cause depended. Thus, if the district court had addressed the merits of the magistrate judge's Recommendation, it might have ordered a full Franks hearing but could not properly have granted the motion to suppress. And as the evidence at trial later

-17-

established that all the *facts* in the warrant affidavit were true -- except that Moore's girlfriend, not Moore, was the registered owner of the black Yukon -- there is little if any likelihood that evidence seized in the warrant search would have been suppressed.

Turning to the district court's ruling, it is undisputed "that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." Alderman v. United States, 394 U.S. 165, 171-72 (1969); see United States v. Salvucci, 448 U.S. 83, 86-87 (1980), and cases cited. "The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched." United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994). The defendant may not rely on "positions the government has taken in the case" but must "present evidence of his standing, or at least . . . point to specific evidence in the record which the government presented [that] established his standing." United Stats v. Zermeno, 66 F.3d 1058, 1062 (9th Cir. 1995). Whether defendant has an expectation of privacy is a question of fact we review for clear error; whether the expectation is reasonable is a question of law. See United States v. Kiser, 948 F.2d 418, 423 (8th Cir. 1991), cert. denied, 503 U.S. 983 (1992). Here, the district court found that Moore failed to prove he had an expectation of privacy in Apartment 234.

1. Moore argues the district court clearly erred because Officer Steffen's warrant affidavit averring that Moore is "living at 4895 Ashley Ln #234" was sufficient evidence to establish his standing. We agree with Moore (and reject the government's contrary argument) that a warrant affidavit is evidence that must be weighed in determining this issue of fact, unlike the pleadings and litigation "positions" at issue in Zermeno. But the district court did not refuse to consider the warrant affidavit; it *found* that the affidavit, being of "dubious validity," did not satisfy Moore's burden of proof. This finding was not clearly erroneous. Despite the government advising at the start of the suppression hearing that standing was an issue,

-18-

Moore introduced no affirmative evidence supporting his claim that he lived at or otherwise had a sufficient interest in Apartment 234, the premises to be searched. Instead, he relied *entirely* on one of the three statements in the Steffen affidavit that *Moore* had discredited by contending they were recklessly and materially false.[4]

2. Moore further argues the district court abused its discretion by denying his motion to reopen the suppression hearing. The court concluded that Moore simply wished to reopen the record to bolster his standing argument, raised no newly discovered evidence, and failed to explain why he did not fully address the issue at the prior hearing. We agree this ruling was not an abuse of discretion. Had Moore moved for a full Franks hearing, arguing he had made the required substantial preliminary showing and standing was one of the issues to be addressed, the district court might have ruled differently. But Moore did not proceed in that fashion.

3. Alternatively, Moore argues the district court abused its discretion in denying his pretrial motion in limine precluding the government, on grounds of judicial estoppel, from introducing evidence connecting Moore to Apartment 234, including testimony that he lived there, because that was contrary to its position in opposing his motion to suppress. This contention is without merit. "[I]t is well settled

---

[4]Moore further argues the district court abused its discretion by permitting the government to challenge his standing because it obtained the warrant by representing that Moore lived there. The record does not support this contention. Central to the affidavit's showing of probable cause was that Clark told Officer Steffen that he brought stolen wallets to the apartment where "Lucky lives." The affidavit then averred that the precise address, and that Moore was the person "living" there, were facts uncovered by "further investigation, and another interview with Clark." In the warrant application, the first paragraph describing property that would be found at the premises to be searched recited, "Any/all identification belonging to people that do not reside at 4895 Ashley Ln #234." This refutes the contention that Moore living there was the factual basis on which the warrant was obtained. The warrant issued on probable cause that "Lucky" was engaged in criminal activity at Apartment 234.

-19-

that the Government may not be estopped on the same terms as any other litigant" because of "the interest in the citizenry as a whole in obedience to the rule of law." United States v. Grap, 368 F.3d 824, 830 (8th Cir. 2004) (quotation omitted). Here, at the suppression hearing, the government contested Moore's standing and defended the warrant on the merits, as it was entitled to do. When the motion to suppress was denied, the government was free to introduce relevant evidence that had been seized in the warrant search. Nothing precluded the government from introducing evidence linking Moore to Apartment 234 and its contents, whether the evidence showed he lived there or simply used the apartment to conduct criminal activities. There was no abuse of the district court's substantial evidentiary discretion.

## IV. Sentencing Issues

Six appellants challenge their sentences, arguing advisory guidelines errors in determining the amount of fraud loss and number of fraud victims, substantive unreasonableness of some sentences, and a procedural error not preserved in the district court. We review the district court's findings regarding amount of fraud loss and number of victims for clear error. United States v. Miell, 661 F.3d 995, 997-98 (8th Cir. 2011), cert. denied, 132 S. Ct. 1777 (2012). We review substantive reasonableness under a deferential abuse of discretion standard, bearing in mind that, when a district court "has sentenced a defendant below the advisory guidelines range, it is nearly inconceivable that the court abused its discretion in not varying downward still further." United States v. McKanry, 628 F.3d 1010, 1022 (8th Cir.) (quotation omitted), cert. denied, 131 S. Ct. 1837 (2011). We will not sustain a procedural challenge to the district court's discussion of the 18 U.S.C. § 3553(a) sentencing factors by a defendant who did not object to the adequacy of the court's explanation at sentencing. See United States v. Krzyzaniak, 702 F.3d 1082, 1085 & n.3 (8th Cir. 2013).

**A. Maxwell.**  Maxwell, an organizer and leader of the conspiracy, pleaded guilty to conspiracy to commit bank fraud, aggravated identity theft, and conspiracy to commit concealment money laundering.  The government moved for a downward departure from his advisory guidelines sentencing range of 235 to 293 months in prison due to his assistance in prosecuting co-conspirators and acceptance of responsibility.  The government recommended a sentence in the 130 to 159 month guidelines range.  The district court granted a downward departure and sentenced Maxwell to 140 months in prison.

On appeal, Maxwell first argues the district court clearly erred in determining the amount of fraud loss.  The TeleCheck loss of $582,576 should be excluded, he argues, because TeleCheck is not a bank.  Excluding TeleCheck's loss would reduce the total loss to less than $1M, resulting in a two-level reduction in the loss enhancement.  Compare U.S.S.G. § 2B1.1(b)(1)(H) & (I).  The loss amount in a conspiracy includes foreseeable losses caused during the commission of the offense.  U.S.S.G. § 1B1.3(a)(1)(B) & comment. (n.2).  As we have explained, the government proved that the scheme to use fraudulent checks and identification documents to obtain cash from retailers was part of the overall bank fraud conspiracy.  TeleCheck's loss resulted from the fraudulent retailer activities.  "[W]hen calculating loss amounts, district judges are in a unique position to assess evidence and estimate the loss based upon that evidence."  United State v. Theimer, 557 F.3d 576, 579 (8th Cir. 2009) (quotation omitted).  There was no clear error including TeleCheck's loss in the actual or intended loss resulting from the conspiracy, resulting in a total loss between $1 million and $2.5 million.  See U.S.S.G. § 2B1.1, comment. (n.3(A)).

Maxwell next argues the district court erred in determining that the number of fraud victims should include more than three hundred identity theft victims because the number of victims should be limited to entities that incurred financial loss.  We agree with the district court that the number of victims properly includes persons whose identities were used unlawfully.  See U.S.S.G. § 2B1.1, comment. (n.4(E)).

Maxwell's plea agreement conceded that he "created the false and fictitious identification documents and counterfeit checks using stolen and fraudulently obtained means of identification of hundreds of victims." There was no clear error.

Finally, Maxwell argues that the sentence is unreasonable because the district court did not adequately address his mitigating arguments under 18 U.S.C. § 3553(a) -- substantial assistance to the government, a supportive network of friends and relatives, and the alleged inflation of his criminal history with conduct that occurred in the 1980s. At sentencing, the district court granted a downward departure for Maxwell's substantial assistance, commended his support network, and explicitly weighed these mitigating factors against the scale of the conspiracy. There was no procedural error, plain or otherwise. Likewise, the contention that the sentence was substantively unreasonable because he received a lesser downward departure than other government cooperators is without merit. "The extent of a downward departure is not reviewable absent an unconstitutional motive." United States v. Deering, 762 F.3d 783, 786 (8th Cir. 2014) (quotation omitted).

**B. Royals.** Royals pleaded guilty to one count of conspiracy to commit bank fraud and one count of aggravated identity theft. Royals was a conspiracy leader who began participating in 2006, using his card printer to create fake identification cards. He recruited other conspirators. He was sentenced to 120 months in prison, a substantial downward departure from his advisory range of 210 to 262 months based on his assistance to the government in prosecuting the conspiracy.

On appeal, Royals argues the district court erroneously inflated his fraud loss calculation by including losses caused by the conspiracy during the time Royals was incarcerated. There was no clear error. First, Royals waived this contention by stipulating in his plea agreement "that the offense level for Count 1 should be increased by 16 levels because the loss attributable to the defendant exceeded $1,000,000," the loss determined by the district court. "A defendant may not

challenge an application of the Guidelines to which he agreed in a plea agreement (unless he proves the agreement invalid or succeeds in withdrawing from it)." Krzyzaniak, 702 F.3d at 1084 (quotation omitted). Second, the contention lacks merit. "If a conspiracy is effected while the defendant is incarcerated and he has not withdrawn from the conspiracy, his responsibility is curtailed only if those acts were not reasonably foreseeable at the time of his incarceration." United States v. Hodge, 594 F.3d 614, 620 (8th Cir.), cert. denied, 560 U.S. 958 (2010). Royals does not claim that he affirmatively withdrew while incarcerated, or that the actions of his co-conspirators exceeded the scope of his original agreement.

**C. Burks.** Conspiracy leader Burks received a 252-month prison sentence. On appeal, he argues the district court clearly erred by declining to award him a two-level reduction for acceptance of responsibility. Burks explains that the reduction was appropriate because he admitted to the jury that he defrauded retailers and went to trial only to argue that he did not violate the federal bank fraud statute because he lacked specific intent to defraud a bank. The defendant bears the burden on this issue; we will reverse only if the district court's determination "is so clearly erroneous as to be without foundation." United States v. Spurlock, 495 F.3d 1011, 1014 (8th Cir.) (quotation omitted), cert. denied, 552 U.S. 1054 (2007). This is not one of those "rare situations" where "a defendant who puts the government to its proof at trial and denies factual elements of guilt warrant[s] this adjustment." United States v. Patten, 397 F.3d 1100, 1105 (8th Cir. 2005). Burks received the specific intent instruction he requested, and the jury still convicted him of bank fraud. There was no clear error.

Burks further argues the district court clearly erred in imposing a four-level enhancement for being an organizer or leader of the criminal activity. However, as he acknowledged at oral argument, our recent holding "that the defendant [need] organize or lead only one participant to trigger" the enhancement forecloses this argument. United States v. Irlmeier, 750 F.3d 759, 763 (8th Cir. 2014), citing United

States v. McMullen, 86 F.3d 135, 138 (8th Cir. 1996). The trial evidence we have previously discussed established that Burks organized or led at least one participant.

**D. Powell.** Powell's advisory range was 360 months to life based on his offense convictions and extensive criminal history. The district court granted a downward variance and sentenced him to 300 months in prison. Powell claims the district court procedurally erred by not considering all of the § 3553(a) factors, but he did not object at sentencing to the district court's consideration of the § 3553(a) factors. The district court referred to the seriousness of the crime, Powell's extensive criminal history, the need to protect the public from further criminality, and Powell's role in the conspiracy. There was no procedural error.

Powell further argues that his sentence violates due process and was substantively unreasonable because he received a higher sentence than his co-conspirators, resulting in "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Powell names only one co-defendant whose sentence is disparate, Mr. Sharps, who allegedly received a 32-month sentence. As Sharps is not an appellant, his sentencing record is not before us. Trial records and the government's brief reveal that Sharps cooperated in the prosecution and had a smaller role in the conspiracy than Powell, in which case Powell's conduct and record differ from Sharp's. Powell's criminal history category was VI. The only appellants with Category VI criminal histories are Royals and Burks. Royals cooperated extensively with the government and received an acceptance of responsibility reduction and downward departure. Burks received a somewhat lower 252-month sentence, but Powell had a higher offense level than Burks because Powell recruited his minor son to join the conspiracy. The record establishes neither unwarranted sentence disparity nor a violation of Powell's right to due process.

**E. Allen.** Allen's advisory guidelines range was 70 to 87 months in prison. The district court determined the loss amount was between $120,000 and $200,000 and the number of victims was between 50 and 250 based on eleven banks that incurred financial losses from the fraudulent ECF checking accounts and forty eight persons who suffered losses when they unwittingly deposited ECF checks. The district court sentenced Allen to 80 months in prison.

On appeal, Allen argues the fraud loss and number of victims determinations were clearly erroneous because they depended on the testimony of Vinicia Williamson, whom the jury discredited. He further argues there was insufficient evidence to hold him responsible for losses and victims caused by ECF checks passed after the ECF accounts closed. But Williamson testified that Allen, in the presence of Powell, provided her with a check from a closed ECF account, which he ripped from a new book of checks. The jury's acquittal verdict on two counts did not preclude the district court from considering Williamson's testimony for sentencing purposes. Other trial evidence established a significant connection between Allen and Powell, and showed Allen's involvement in the ECF accounts, including split deposits that generated negative balances in the thousands of dollars, supporting the inference that Allen supplied conspirators with ECF checks after the accounts were closed. The evidence established that approximately $195,000 in checks passed on the ECF accounts, $170,000 after they were closed. Losses caused and victims harmed by fraudulent checks from the ECF accounts were reasonably foreseeable relevant conduct to Allen's offense. See U.S.S.G. § 1B1.3(a)(1)(B). The district court did not clearly err in calculating the amount of fraud loss and the number of fraud victims.

Allen further argues that an evidentiary sentencing hearing was required because he disputed material facts in the PSR, relying on United States v. Morehead, 375 F.3d 677 (8th Cir. 2004). As we have previously noted, "Morehead involved a PSR following a guilty plea." Theimer, 557 F.3d at 578. Here, as in Theimer, the

district court permissibly "made its findings with respect to the disputed [facts] based on the evidence at trial, not on the PSR." Id.

**F. Hamilton.** The district court sentenced Hamilton to 57 months in prison, within his advisory range of 51 to 63 months. On appeal Hamilton first argues the district court clearly erred in determining the amount of fraud loss attributable to his offense because (1) the jury acquitted him of a substantive bank fraud count relating to a split deposit into his own account, so he was not responsible for the loss on all checks and accounts bearing his name; and (2) he was not responsible for losses caused by conspirator Majorie Neely because the evidence did not establish that Hamilton recruited her. There was no clear error. Due to the differing burdens of proof at trial and sentencing, the sentencing judge may consider facts underlying an acquitted count that it finds to be sufficiently reliable. McKanry, 628 F.3d at 1020. Here, the acquitted count involved a fraudulent check transaction by conspirator Williamson, and trial evidence established that Hamilton provided Williamson access to accounts and fraudulent checks bearing his name. Neely testified that she met conspiracy leader Powell through Hamilton.

Hamilton further argues the § 3553(a) sentencing factors warranted granting his request for a downward variance. A sentence within the Guidelines range is presumptively reasonable on appeal. United States v. Eason, 643 F.3d 622, 626 (8th Cir. 2011), cert. denied, 132 S. Ct. 1053 (2012). Hamilton cites no factors that overcome this presumption. Given his role as a conspiracy manager and his substantial criminal history -- including convictions for kidnaping and promotion of prostitution -- his within-range sentence was consistent with the § 3553(a) factors.

Finally, in addition to challenging his sentence, Hamilton argues the district court abused its discretion by allowing him to proceed pro se when filing post-trial motions for acquittal and new trial. The record is to the contrary. After the conviction, Hamilton filed two pro se motions, advising in one that he wished to

proceed pro se "as of now."  The district court rejected the motions as untimely and meritless.  Hamilton's trial counsel did not move to withdraw until July 8, 2013, and Hamilton remained represented by trial counsel through his July 22, 2013, sentencing hearing.  Hamilton's new counsel on appeal does not dispute the government's claim that he was represented by counsel during post-trial proceedings.  Thus, whatever error Hamilton is claiming, it is apparent there was no reversible error.  "There is no constitutional or statutory right to simultaneously proceed pro se and with benefit of counsel."  United States v. Agofsky, 20 F.3d 866, 872 (8th Cir.), cert. denied, 513 U.S. 909 and 513 U.S. 949 (1994).

## V. Conclusion

For the foregoing reasons, the seven judgments of the district court are affirmed.

_____