# United States Court of Appeals

### For the Eighth Circuit

_____

No. 13-3335

_____

United States of America

*Plaintiff - Appellee*

v.

Isreal Owen Hawkins, Jr.

*Defendant - Appellant*

_____

No. 13-3336

_____

United States of America

*Plaintiff - Appellee*

v.

Teresa Brown

*Defendant - Appellant*

_____

No. 13-3337

_____

United States of America

*Plaintiff - Appellee*

v.

Johnny Heurung

*Defendant - Appellant*

_____

No. 13-3338

_____

United States of America

*Plaintiff - Appellee*

v.

William Miller

*Defendant - Appellant*

_____

No. 13-3339

_____

United States of America

*Plaintiff - Appellee*

v.

Martin Roper

*Defendant - Appellant*

_____

Appeals from United States District Court
for the Western District of Missouri - Kansas City
_____

Submitted: April 13, 2015
Filed: July 29, 2015
_____

Before BYE, BEAM, and SMITH, Circuit Judges.
_____

BEAM, Circuit Judge.

Isreal Hawkins, Teresa Brown, Johnny Heurung, William Miller, and Martin Roper were convicted of various crimes related to their involvement in promoting and/or selling stock for Petro America Corporation (Petro America), an unregistered company that had no value. The defendants appeal their convictions and challenge rulings the district court[1] made with respect to various pre-trial and post-trial motions, juror selection, and numerous evidentiary issues. Heurung also appeals his sentence. We affirm.

## I.    BACKGROUND

On June 15, 2011, a grand jury sitting in the Western District of Missouri issued a superseding indictment (the "Indictment") charging the defendants and seven additional alleged coconspirators with conspiracy to commit securities fraud and wire fraud, in violation of 18 U.S.C. § 371. The Indictment further charged Hawkins with aiding and abetting securities fraud, in violation of 15 U.S.C. § 77q and 18 U.S.C. § 2; aggravated currency structuring, in violation of 31 U.S.C. §§ 5324(a)(3) and (d)(2);

_____

[1]The Honorable Brian C. Wimes, United States District Judge for the Western District of Missouri.

money laundering, in violation of 18 U.S.C. § 1957; and two counts of wire fraud, in violation of 18 U.S.C. § 1343. In addition to the conspiracy charges, Brown was charged with one count of securities fraud and six counts of wire fraud; Heurung was charged with two additional counts of wire fraud; and Miller was charged with one count of money laundering and one count of wire fraud. The remaining counts in the Indictment related to the seven other alleged coconspirators, all of whom pled guilty to various charges. Hawkins, Brown, Heurung, Miller and Roper maintained their innocence and proceeded to trial. Hawkins' defense theory was that Petro America was a legitimate company and that the government was prosecuting the codefendants so that it could confiscate the company's substantial assets. The remaining defendants acknowledged that Petro America was a sham but claimed they had believed in good faith that the company was real and that they could promote and/or sell its stock. A jury found each defendant guilty on all charged counts.[2]

### A.    Summary of the Petro America Scam

Between September 2008 and November 2010, more than 12,000 investors purchased Petro America's stock, at a cumulative cost of at least $10.2 million. During this time period, Hawkins, Heurung and others relentlessly represented to shareholders and prospective investors that Petro America was an oil, gas and mining company that had acquired numerous assets collectively worth hundreds of billions of dollars and that the company's stock would soon be traded on a public exchange. In reality, Petro America had no board of directors, engaged in no profitable business activities, kept abysmal financial records, and never took any substantial steps to "go public." Further, Petro America's assets essentially amounted to ownership of a small

---

[2]The district court, upon the government's request, dismissed one of the wire fraud counts against Heurung shortly before the case was submitted to the jury.

company whose stock was traded on the pink sheets,[3] typically for fractions of a penny, and a vaguely defined stake in a packaging company that never earned Petro America a cent of profit. Instead, it appears that all of Petro America's income came from the sale of the company's stock to private investors, that only a small portion of the investors' funds were used for legitimate business purposes, and that Hawkins syphoned off most of the company's money into his own pocket. The record further indicates that Hawkins gifted millions or billions of shares to his coconspirators, who in turn sold the stock to private investors and kept most or all of the proceeds. In sum, the government's evidence overwhelmingly established that Petro America was a sham entity that had no real value and that Hawkins, along with several of his coconspirators, used the company as a vehicle to dupe thousands of unwitting investors out of millions of dollars.

Hawkins founded Petro America in the summer of 2007. Hawkins incorporated Petro America in Kansas and subsequently registered the company in Missouri as a foreign corporation. In or around September 2008, Hawkins and several coconspirators, including Brown, Miller, and Roper, began selling Petro America's stock to private investors, many of whom resided in Missouri. It is undisputed that the coconspirators' sale of stock in Missouri was unlawful because Hawkins had not registered the stock with the Securities Division of the Missouri Secretary of State ("Securities Division") nor qualified for an exception from, or an exemption to, registration. See Mo. Rev. Stat. Ann. §§ 409.1-102, 409.3-301, and 409.4-401 (collectively stating it is unlawful for a person to offer or sell an unregistered security in Missouri unless the security is a federally covered security or fits within an enumerated exemption and that persons transacting business as a broker-dealer of securities generally must be registered with the state). This fact

_____

[3] Several of the government's experts collectively testified that the "pink sheets" essentially provide an over-the-counter trading market for companies that wish to avoid some or all of the listing requirements for trading on national securities exchanges, such as the Nasdaq stock market.

came to light in early October 2008 after the Securities Division began receiving complaints from consumers around the country about an email that Roper sent out on September 20, 2008. Roper's email claimed that Petro America was an oil and gas company that was worth $68 million, that the company would go public within six months, and that investors would make $200,000 off a $100 dollar investment. The email also instructed investors to send funds directly to Roper and provided his address and a Missouri phone number.

The Securities Division began investigating Petro America in early October 2008. As part of this process, officials from the Securities Division interviewed Roper, who admitted that he knew Petro America's stock was not registered, that he was not registered to sell securities, and that sending the email was a "mistake." Roper also indicated that he was familiar with securities law and had even taken a series of examinations that are prerequisites to becoming a registered broker of securities in the State of Missouri. See Mo. Code Regs. Ann. tit. 15, § 30-51.030(2)(A).

On November 12, 2008, the Securities Division issued a Cease and Desist Order (the "Order") that prohibited Petro America, Hawkins, Roper, their agents, and anyone "with knowledge of [the] Order" from offering or selling or aiding in the offering or selling of Petro America's securities in Missouri until the company registered its securities or qualified for an exemption to registration. The Order explicitly stated that Hawkins and Roper had used unlawful means to promote and sell the company's stock, including (1) making misleading statements about the value of the stock; and (2) omitting to state numerous material facts, such as information related to the company's financial condition, the background of the company and its officers, and that the company's stock was not registered. See Mo. Rev. Stat. Ann. § 5-501(2). The Securities Division mailed the Order to Petro America, Hawkins, and Roper and posted the Order on the Missouri Secretary of State's website. Although Hawkins and Roper initially tried to challenge the Order, they quickly abandoned

these efforts and took a number steps to resolve their issues with the Securities Division, including paying fines and consenting to the Order. The record establishes, however, that Hawkins never took substantial steps to register Petro America's stock or qualify for an exemption to registration in Missouri or any other jurisdiction.[4]

It is undisputed that each of the defendants read the Order shortly after it was issued and that the Order remains in effect to this day.[5] Nevertheless, between November 2008 and November 2010 the defendants collectively flouted virtually every mandate contained in the Order. Hawkins, apparently in an attempt to get around the Order, began "gifting" shares to various coconspirators, including Brown, Miller and Roper, who continued to support Petro America and promote the company's stock. The coconspirators in turn sold their shares to investors, and some of the coconspirators, including Brown, also kicked back a portion of their profits to Hawkins. The record indicates that Brown derived $3,047,202 by selling Petro America stock to thousands of investors and that she transmitted more than $1,000,000 of these proceeds back to accounts that Hawkins personally owned or controlled. Similarly, Miller and Roper derived $165,431 and $93,420, respectively,

---

[4]In October 2008, Petro America filed a Form D with the Securities and Exchange Commission (SEC) claiming an exemption from registration under Rule 504 of Regulation D. Petro America withdrew this application approximately two weeks after it was filed. In addition, the government presented testimony from two certified public accountants (CPAs) who claimed that Hawkins secured their services and paid them a retainer to help Petro America organize its books in anticipation of the company attempting to make a public offering. Both witnesses indicated that Petro America's financial records were disorganized and woefully incomplete and that Hawkins cut off contact with them when they pressed him for more complete records. One of the CPAs further testified that Petro America's books were in such disarray that the company was "totally inauditable" and thus "would never be listed" on a public stock exchange.

[5]The Order became final on April 16, 2010.

from the sale of Petro America stock to dozens of investors.[6] Based on the evidence it is unlikely that Heurung sold Petro America stock to private investors. However, as discussed in more detail below, Heurung played a key role in illegally promoting Petro America's stock to investors, and he received approximately $260,000 in "commissions" for his efforts.

Petro America's widespread success at attracting investors can largely be attributed to the tenacious efforts Hawkins, Heurung and Brown put into pitching the company. The record also indicates that Roper, and to a lesser extent Miller, played significant behind-the-scenes roles with the company. Around the time the Securities Division started investigating Petro America, Hawkins and Heurung both began hosting separate weekly "shareholder meetings." Hawkins typically hosted his meetings in front of a live crowd at various locations in and around Kansas City, but the meetings were also broadcast via conference calls to interested parties, at times numbering in the thousands. Between October 2008 and October 2010, Hawkins hosted at least 50 shareholder meetings. Brown, Roper and Miller regularly attended these shareholder meetings, and there is some evidence that Roper occasionally helped lead or facilitate the meetings. Various witnesses described the Hawkins-led meetings as being akin to pep rallies with religious overtones. Witnesses stated that Hawkins often arrived fashionably late, flanked by a group of pastors who became

---

[6]Hawkins frequently deposited large numbers of checks and cashiers' checks into several accounts that Petro America held. The record further indicates that Hawkins withdrew, in cash, most of the money that went into these accounts (at least $1.2 million) and that he structured the withdrawals to avoid the banks' currency transaction reporting requirements. The government presented testimony from Stephen Browne, a CPA with extensive experience in investigating business fraud. Browne stated that he had performed "dozens and dozens" of fraud investigations and that he had never seen such a high percentage of a business account's funds withdrawn as cash.

known as the Ministers' Alliance,[7] and that the room "exploded" when he entered. Hawkins often prayed during his meetings and claimed that Petro America was a blessing from God that would benefit the community and transform shareholders into millionaires and billionaires. Hawkins also claimed that Petro America would significantly reduce unemployment and stated that he hoped his humanitarian efforts would earn him a Nobel Peace Prize. Several witnesses stated that Hawkins' portrayal of himself as a deeply religious man who had support from the religious community lent both Hawkins and Petro America an air of credibility and significantly contributed to their decision to invest in the company.[8]

Hawkins used his platform at the shareholder meetings to spew misinformation about Petro America's financial condition and its supposed progress in preparing a public offering. Hawkins regularly represented that Petro America was on the verge of "going public," and claimed the company's delay in accomplishing this feat was due to minor glitches in paperwork or government interference in Petro America's affairs. Hawkins also frequently claimed that Petro America had entered into lucrative oil and gas contracts or had acquired valuable mining claims that were worth billions of dollars. Indeed, by early 2010, Hawkins was regularly claiming that Petro America had $284 billion in assets, which, according to one expert witness,

---

[7]The members of the Ministers' Alliance publicly supported Hawkins' efforts, and some of them sold Petro America stock to their parishioners. Several members of the Ministers' Alliance were charged in the Indictment with various crimes and pleaded guilty.

[8]Several of the government's experts claimed that the Petro America scam involved a form of affinity fraud in which the coconspirators targeted religious persons prone to believe that another religious person would not mislead them. One commentator has defined "affinity fraud" as "securities and investment fraud that targets members of an identifiable group perpetrated by a member within the group or someone claiming a desire to assist group members." Lisa M. Fairfax, "With Friends Like These . . .": Toward a More Efficacious Response to Affinity-Based Securities and Investment Fraud, 36 Ga. L Rev. 63, 70 (2001).

would dwarf the assets owned by companies such as Wal-Mart and Coca-Cola. Ironically, however, a hat was sometimes passed around at the shareholder meetings to collect donations to pay for the meetings. Hawkins at various times justified the company's need to collect donations for meetings, attorneys, and other costs by explaining that Petro America was rich in assets, but poor in cash.

Starting in or around October 2008, Heurung began discussing Petro America in weekly conference calls he hosted. Various witnesses described Heurung as Petro America's financial expert, and Heurung claimed that he traveled around negotiating contracts and acquiring assets for Petro America. Heurung also represented to shareholders that Petro America was worth more than Wal-Mart and AT&T, that he had inside knowledge of Petro America's efforts to go public, that attorneys and CPAs were going over the company's "asset values" and "accounting values" with a "fine-tooth comb," and that the company's shares would soon be traded publicly and at astronomically high values. Heurung also used his platform to persistently pitch other (rather dubious) investment opportunities, including trading in "strips and coupons" and creating tax shelters in Panama. The record further indicates that Heurung and his secretary, Joy, organized and hosted a cruise for Petro America shareholders.

While Hawkins and Heurung served as the public pitchmen for Petro America, Brown was known as the company's "communications highway" and the person you went to "if you needed to get something from [Hawkins]." Brown regularly sent investors written summaries of Hawkins' shareholder meetings and fielded questions from people about Petro America. The record further indicates that Brown was a primary person to whom prospective investors were referred, that she sold Petro America's stock to over one thousand people and that she signed various agreements on behalf of the company.

As for Roper, the record indicates that he played a role in promoting the company and bolstering Hawkins' credibility. As noted above, Roper authored an email that was widely distributed and lured numerous investors into the Petro America scam. Roper was also a pastor and was a member of the Minister's Alliance. Various witnesses also testified that Roper was close to Hawkins, was "very high up" in Petro America and was considered Hawkins' "right-hand man." The record further indicates that, although Roper had some familiarity with Missouri's securities laws and was explicitly named in the Order, he continued to aggressively promote and sell Petro America stock that Hawkins gifted to him, and even created a website that he used to sell the stock.

The record indicates that Miller played a more minor role in Petro America. Witnesses stated that Miller was close friends with Hawkins and was part of Hawkins' "inner circle" until early 2010, when the two men apparently had a falling out. Miller also attended most of Hawkins' shareholder meetings, but there is little to no evidence that Miller spoke at any of the meetings or helped run them. Indeed, aside from hosting a shareholder Christmas party, it appears that Miller's activities on behalf of the company consisted of selling shares that Hawkins gifted to him and updating friends, family members, and others about events at Petro America.

Throughout the course of the Petro America scam, Hawkins, Heurung and other coconspirators went to great lengths to convince shareholders and prospective investors that Petro America was a legitimate company that was rapidly acquiring valuable assets. In October 2008, Petro America acquired a vaguely-defined interest in a packaging company, Performance Packaging, that utilized an underground storage facility in its business operations. The record establishes that Petro America never exercised control over, or received any financial benefit from, Performance Packaging. Nonetheless, Hawkins and Heurung regularly boasted that Petro America had acquired Performance Packaging and would use the underground facility to store

oil. Petro America issued several press releases to the same effect.[9] Hawkins and his coconspirators also took shareholders and prospective investors on "tours" of Performance Packaging's underground facilities.

In November 2008, Petro America acquired a company called American Southwest Music Distribution ("ASWD") in exchange for approximately $162,500. At the time of the purchase, ASWD was publicly traded on the pink sheets. Hawkins and Heurung frequently claimed that Petro America had acquired ASWD in order to perform a reverse merger[10] so that Petro America could go public more quickly. In June 2009, ASWD's ticker symbol was changed to PTRZ, and the coconspirators began telling shareholders that Petro America had finally gone public. However, the record clearly establishes that Petro America never took any substantial steps toward completing a reverse merger with ASWD or PTRZ, and Petro America's shares were never listed on a public exchange. The conconspirators quickly retracted their claims that Petro America had gone public and made a variety of excuses to explain the delay.

As noted above, Hawkins and Heurung often claimed that they had brought hundreds of billions of dollars of assets into Petro America by negotiating oil and gas deals, purchasing or entering into joint ventures with oil and mining companies, and acquiring mining claims. To Hawkins' and Heurung's credit, the record indicates that Petro America apparently tried to enter into numerous deals to buy and sell oil and purchase or enter into joint ventures with oil and mining companies. However,

---

[9]Bruce Young, one of Performance Packaging's owners, testified that zoning regulations prohibited them from storing flammable materials (i.e., oil) in the facility.

[10]Stephen Browne testified that a reverse merger typically involves a private company purchasing the shares of a public company and then liquidating itself into the public company. Browne stated that this process allows a private company to quickly get listed on a public exchange and "to avoid the complexity that is usually involved in taking the [private] company public."

virtually all of these deals were conditioned on Petro America either satisfying certain conditions related to financing or going public within a particular time frame, and the record demonstrates that the company's inability to satisfy these conditions caused each and every one of the anticipated deals to fall through before they were finalized. Not surprisingly, Hawkins and Heurung never told shareholders that the deals had fallen through and instead represented during shareholder meetings and through press releases that the deals were finalized. Furthermore, the record establishes that the values Hawkins and Heurung attributed to Petro America's supposed mining claims and ventures either were pulled out of thin air or were wildly speculative because Hawkins and Heurung never obtained reasonable appraisals of the mining claims and did not factor in the extraordinary costs and risks associated with developing and/or running a mine. Nevertheless, in or around February 2010, Hawkins and a coconspirator, Clarence Moore,[11] drafted a letter that falsely claimed that Moore was a CPA, represented that Moore had audited Petro America's financial records, and concluded that Petro America had a fair market value of "$284 billion or approximately $24 dollars a share." Hawkins and Heurung referenced this "audit" in their shareholder meetings, and the record indicates that Moore's letter was occasionally given to shareholders and prospective investors who asked questions about Petro America's financial condition or why the company had not yet gone public. Petro America also created an impressive website and contracted with Regus Management Group, LLC, who provided Petro America with "Virtual Office" services and access to a suite in a high rise building in downtown Kansas City.

Hawkins and his coconspirators took numerous additional steps to assuage or silence investors' fears about the legitimacy of the company. For example, the coconspirators regularly informed shareholders that Petro America was working with a transfer agent to prepare the company's public offering, but at various times they

---

[11]Moore was charged in the Indictment and ultimately pleaded guilty to conspiracy to commit securities fraud and conspiracy to commit wire fraud.

also instructed shareholders not to contact the transfer agent or stockbrokers and to instead direct their questions to Petro America officials. However, investors who asked for details about the company's financial condition and its progress in going public typically were given vague answers or told that the information they requested was "confidential." On at least one occasion, Brown sent an email to shareholders instructing them not to take their shares to stockbrokers because doing so was "creating more of a mess [and] making things harder than they need to be for those who are working to get [the company] public." The record indicates that Hawkins publicly (and falsely) claimed that the Order had been resolved and no longer applied to Petro America, and it is undisputed that each of the remaining defendants told shareholders that the company was moving forward in spite of its mounting legal problems. The record further indicates that Hawkins and his coconspirators sometimes ignored shareholders who persisted in asking for detailed information about the company, and there is some evidence that the coconspirators threatened to kick people out of the Petro America "investment program" if they asked too many questions or talked to the media.

As noted above, each of the defendants derived large sums of money from the promotion and/or sale of Petro America stock. The record indicates that Hawkins personally withdrew, in cash, most of the money that went into Petro America's bank accounts, and that he used the money to rent an expensive house, purchase expensive cars, clothes, etc. Similarly, Brown used proceeds derived from Petro America shareholders to purchase a boat, vehicles, expensive jewelry and luggage, etc. The government presented little evidence regarding how Heurung, Miller and Roper used the funds they derived from their promotion and/or sale of Petro America stock. Miller, however, used proceeds from a particularly large stock sale to purchase a $30,000 truck–this transaction is the subject of his money laundering conviction.

Despite the valiant efforts by Hawkins and his coconspirators to perpetuate the Petro America scam, the wheels began to come off in early 2010 when the Internal

-14-

Revenue Service Criminal Investigation Division ("IRS Criminal Division") began investigating the company.[12] The IRS Criminal Division kicked off its investigation by obtaining and reviewing several of the defendants' emails and bank records as well as recordings of the conference calls/shareholder meetings that Hawkins and Heurung hosted. Based on this investigation, officials from the IRS Criminal Division were able to obtain a warrant to search Brown's home that they executed on May 12, 2010. During the search, officials discovered and seized several boxes that contained, inter alia, information about Petro America's shareholders, some of the company's financial records, and Brown's email communications with shareholders and various coconspirators. However, although each of the defendants apparently knew about the raid on Brown's house, Hawkins and Heurung continued to host shareholder meetings in which they touted Petro America's virtues and its bright future, Roper and Miller continued to sell shares, and none of defendants disclosed the raid to shareholders and prospective investors. On or about October 28, 2010, Hawkins was arrested on federal fraud charges. The record indicates that, even after Hawkins was arrested, Roper continued to sell Petro America stock and assure concerned shareholders that the company was moving forward, and Miller deposited at least one check he received in exchange for shares that Hawkins had gifted to him.

On May 12, 2011, Special Agent Devin Fields, who works for the IRS Criminal Division, interviewed Miller. The record indicates that Miller initially denied having personally received money for selling Petro America shares, but he quickly retracted his denial after Agent Fields disclosed that the IRS Criminal Division had evidence that Miller sold his personal shares. Miller then stated that he had 50 million shares that were valued at $24 each and claimed that he sold his shares to "bless people."

---

[12]The IRS Criminal Division commenced their investigation upon the request of the United States Attorney for the Western District of Missouri. The United States Attorney's Office had already been investigating Petro America for several months and had received documents from the Securities Division and the SEC, both of whom had conducted their own investigations of Petro America.

However, Miller also acknowledged that, although he read the Order, he never told persons to whom he sold stock about the Order, explained that Petro America's stock was not registered for sale or exempt from registration, or provided any other disclosures about the stock or Petro America. Miller also indicated that virtually all of his income came from the sale of Petro America stock. Agent Fields testified that he tried to contact Roper on numerous occasions to set up an interview but that he "never heard anything" from Roper.

## B. Pretrial Motions

### 1. Brown's Motion to Sever

Each of the defendants pleaded not guilty to the charges alleged in the Indictment, and the district court scheduled them for a joint trial. The district court appointed a federal public defender to represent Hawkins. Prior to the start of trial, Hawkins moved several times for new counsel. The district court denied each motion. On April 15, 2013, two days before trial started, Hawkins filed a motion for self representation. The district court granted Hawkins' motion in a pretrial conference held on the first day of the defendants' jury trial. At the time the district court granted Hawkins' motion, it explicitly informed him that he would be held to the rules of evidence and procedure. The district court also appointed Hawkins' public defender as standby counsel and informed Hawkins that the public defender would take over representing him if he refused "to follow those procedures and engage in proper conduct." Heurung and Brown subsequently moved to sever their trials from Hawkins' trial based on several vaguely-described concerns, including that Hawkins might try to testify via his questioning of witnesses and then avoid cross-examination by exercising his Fifth Amendment Right to not take the stand. During the trial Brown renewed her motion to sever several times claiming, inter alia, that Hawkins' courtroom conduct prejudiced her and that Hawkins' defense was antagonistic to hers. The district court denied each motion.

## 2.    Roper's Motion to Subpoena Witnesses

Shortly before trial was set to begin, Roper filed a motion for funds to retain an expert in federal securities law.  Roper claimed a securities expert was needed to help "determine if certain exemptions under SEC Rules 144, 504 and 508 were available [to] Petro America" and whether the company made a good faith attempt "to comply with SEC laws."  The magistrate judge[13] denied Roper's motion as untimely. At the start of trial, Roper renewed his motion and additionally requested that the court pay the expenses for several geologists who would testify about the value of Petro America's mining claims and ventures as well as numerous factual witnesses who would testify about the company's stock and assets and the fact that Hawkins and others publicly stated that the Order did not prevent shareholders from selling their own stock.  The district court did not immediately rule on Roper's motion and instead took the matter under advisement.  Roper later renewed his motion, claiming that the witnesses were necessary for him to adequately present his good faith defense, but the district court ultimately denied the motion.

## C.    Trial

### 1.    Jury Selection

Hawkins and Heurung both raise issues related to events that occurred during jury selection.  We begin with Hawkins.  At the beginning of voir dire each venireperson was asked to disclose, inter alia, his or her occupation.  Venireperson No. 11, who was ultimately selected as a member of the jury ("Juror No. 2"), stated that she worked as a tailor at "Hall's on the Plaza."  Hawkins did not ask Juror No. 2 any follow up questions during voir dire.  After the venirepersons introduced

---

[13]The Honorable Sarah W. Hays, United States Magistrate Judge for the Western District of Missouri.

themselves, the district court asked the venirepersons to "bear with [the court]" as it read a list of more than one hundred witnesses who might be called to testify during the trial. The venirepersons were instructed to inform the court if they knew or had a connection to any of the potential witnesses. One of the witnesses the district court mentioned was "David Nordquist of Overland Park, Kansas;" however, the court did not mention Nordquist's occupation or any other identifying information. None of the venirepersons indicated that they knew Nordquist. During the second full week of trial, the government called Nordquist to the stand. Nordquist testified that he had worked in the Men's Department at Hall's Clothing Company. Nordquist further testified that Hawkins had purchased dozens of items at Hall's, totaling over $26,000, that Hawkins was a good customer, and that he always paid in cash. Hawkins briefly cross-examined Nordquist but did not ask whether Nordquist knew any of the jurors. Juror No. 2 also did not indicate whether she knew Nordquist.

After the jury convicted Hawkins, he filed a timely pro se Rule 33 motion for a new trial. Fed. R. Crim. P. 33. In his motion Hawkins claimed that, after the trial, he realized that he knew Juror No. 2 because she worked at Hall's and had performed alterations on some of his suits. Hawkins also made an unsubstantiated allegation that Juror No. 2 knew Nordquist and had lied to the district court about her relationship with him. Hawkins later filed a second Rule 33 motion based on an affidavit obtained by the Federal Public Defender's Office. The affidavit indicated that an investigator had spoken with Nordquist, who claimed that he had known Juror No. 2 for fifteen years, that they had both worked at Hall's for twelve years, and that she would fit and tailor items for customers. However, Nordquist also stated that he was unaware that Juror No. 2 served on the jury. The record indicates that the district court denied Hawkins' Rule 33 motion on several grounds, including that the affidavit failed to establish that Juror No. 2 recognized Nordquist or intentionally hid her relationship with him, particularly since she disclosed that she worked at Hall's.

Heurung claims the district court erred in denying his <u>Batson</u>[14] challenge. Three members of the venire panel were African Americans. The record indicates that one of the African American venirepersons was struck for cause due to hardship and that one was selected to the jury. Heurung's challenge centers on the government's decision to exercise a peremptory strike on the third African American prospective juror–Venireperson No. 28. During voir dire, the district court asked the members of the venire panel whether any of them had a family member or close friend who had been convicted or accused of a serious crime. Venireperson No. 28 responded that she would prefer to speak to the district court in private. Venireperson No. 28 subsequently disclosed that her son had been convicted of federal drug charges in Kansas, but she indicated that she could be a fair and impartial juror. The government's prosecutor asked Venireperson No. 28 if she felt that law enforcement and the courts had treated her son fairly. Venireperson No. 28 responded that "I had a little doubt about the prosecutors. It was a group of them that did the crime and that talked and I think they put everything on him." When asked if her feelings about her son's experience would affect her, Venireperson No. 28 responded "Not really, because he has always been in special education, his comprehension is not very good. So it could have been that he just didn't understand."

The government subsequently exercised one of its peremptory strikes on Venireperson No. 28. Heurung made a <u>Batson</u> challenge in which his codefendants joined.[15] The district court held that Heurung had made a prima facie showing that the government had struck Venireperson No. 28 because of her race and required the government to explain its reasons for striking her. The government stated that it was concerned about Venireperson No. 28's ability to be impartial based on her statements indicating that she thought the federal prosecutors might not have treated her son fairly. The government also expressed concern that Venireperson No. 28 might

---

[14]<u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).

[15]Only Heurung appeals the district court's denial of the <u>Batson</u> challenge.

hesitate to convict lower level members of the conspiracy. After allowing Heurung to provide rebuttal argument, the district court denied the Batson challenge on the grounds that the government had provided a non-pretextual, race-neutral reason for striking Venireperson No. 28. In support of its conclusion, the district court noted that Venireperson No. 28 had expressed "some hesitancy [about] how fairly she felt [her son] was treated" and further recognized that the government had not attempted to strike the remaining African American juror.

### 2. Exhibit 1000 and Motions for Acquittal

Approximately ten days into the defendants' trial, the government provided defense counsel, including counsel for Heurung, with draft timelines of each defendant's involvement in the Petro America scam. The government further disclosed that it intended to offer the exhibits into evidence through Agent Fields, who was slated to testify as an expert for the government. The government had not previously disclosed that it would create the timelines or that it planned to offer them into evidence. The draft timeline relevant to Heurung, Exhibit 1000, was a fifteen page document that summarized the duration and extent of Heurung's role in the Petro America scam. Although Exhibit 1000 summarized several types of voluminous records, including conference calls in which Heurung participated and emails that he or his secretary authored, it also summarized the testimony of numerous fact and expert witnesses. The government solicited feedback from the defendants regarding whether the timelines' factual assertions were unsupported by the record or contained language that was inflammatory or unfairly prejudicial. With respect to Exhibit 1000, Heurung's counsel requested several edits, including removing words such as "fraud," "illegal," and "scheme," and it appears that the government made the requested edits. Nonetheless, the record indicates that the version of Exhibit 1000 that was admitted

into evidence occasionally misstated witness testimony and frequently described evidence in legally conclusory terms.[16]

Heurung twice objected to the admission of Exhibit 1000 based on a variety of arguments. Heurung first claimed that the government's eleventh-hour disclosure of Exhibit 1000 placed him at a tactical disadvantage because he did not have time to adequately review and object to material in the timeline. Heurung further noted that the district court had not allowed the jury to take notes and expressed concern that the timeline would usurp the jury's function in remembering the evidence and that the jurors would use the exhibit as their outline of the evidence. The district court ultimately concluded that, given the complexity of the evidence and the volume of witness testimony, Exhibit 1000 would be helpful to the jury and was admissible under the Federal Rules of Evidence. Exhibit 1000 ultimately was admitted through Agent Fields, and Heurung was given the opportunity to cross-examine Agent Fields' testimony. During jury instructions, the district court informed the jury that various summaries and charts had been admitted into evidence, that the authenticity of the summaries and charts had been challenged, and that the jury was responsible for determining what weight, if any, to give to these exhibits. Heurung did not object to this instruction. During deliberations, the jury asked for Exhibit 1000, and the district court provided it to them over Heurung's objection.

At the close of the government's case-in-chief, each of the defendants moved for judgment of acquittal. The district court denied each of these motions. During the trial, Miller filed a motion challenging the government's proposed willful blindness instruction on the grounds that the evidence did not support the instruction.

---

[16]For example, on numerous occasions Exhibit 1000 prefaces summaries of Heurung's conference calls by stating that Heurung "made the following false and misleading statements." At one point, Exhibit 1000 also accuses Heurung of making "material misrepresentations and omissions designed to bolster Petro's stock offering."

The district court denied Miller's motion and ultimately gave the jury the willful blindness instruction. As noted above, the jury found each of the defendants guilty on all counts charged.

### D. Heurung's Sentence

Prior to Heurung's sentencing hearing, the probation office prepared a Presentence Investigation Report (PSR) that recommended Heurung receive a three-level enhancement for being a manager or supervisor in the Petro America conspiracy. The PSR also recommended a twenty-level loss enhancement on the grounds that Heurung should be held responsible for the entire $10,221,735.29 loss caused by the Petro America scam. Heurung objected to the PSR's supervisor/manager enhancement recommendation and its loss calculations. The district court overruled his objections and adopted the PSR's loss calculations and its recommendation that Heurung receive a manager/supervisor enhancement.

## II. DISCUSSION

### A. Pretrial Motions

#### 1. Brown's Motion to Sever

Brown asserts the district court's denial of her motion to sever deprived her of a fair trial, and she raises two distinct arguments in support of this contention. Brown first claims she was entitled to severance because Hawkins' defense theory was irreconcilable and antagonistic with hers. Brown alternatively argues that the jury was unable to compartmentalize the evidence as it related to her and Hawkins because the district court inadequately instructed the jury regarding Hawkins' pro se representation and failed to sufficiently corral Hawkins' courtroom antics. We do not find either argument persuasive.

"Ordinarily, indicted coconspirators should be tried together, especially where the proof of conspiracy overlaps." United States v. Jarrett, 684 F.3d 800, 804 (8th Cir. 2012) (quotation omitted). "We will not reverse a denial of a motion to sever unless the appellant demonstrates an abuse of discretion resulting in" real and clear prejudice. United States v. Payton, 636 F.3d 1027, 1036 (8th Cir. 2011) (quotation omitted). To satisfy this standard, Brown must show that her defense was "irreconcilable with the defense of [her] codefendant or that the jury [was] unable to compartmentalize the evidence as it relate[d] to separate defendants." Id. at 1037 (quotation omitted). Brown "carries a heavy burden in making this showing." Id. (quotation omitted).

As an initial matter, we hold that Brown has wholly failed to demonstrate that her defense theory was irreconcilable or prejudicially antagonistic with Hawkins' defense. "A defense is irreconcilable when the jury, to believe the core of one defense, must necessarily disbelieve the core of another." United States v. Anderson, 783 F.3d 727, 743 (8th Cir. 2015) (quotation omitted). Here, it is abundantly clear that the jury could have believed the core of Hawkins' defense (Petro America was a legitimate company) without disbelieving the core of Brown's defense (I believed that Petro America was a legitimate company). Indeed, "the jury could have credited either, both, or–as it turned out–neither of their defenses." Id. at 744. Brown therefore has not established that Hawkins' defense was irreconcilable with hers. Further, although Brown's defense proved to be somewhat antagonistic to Hawkins' defense in the sense that she blamed him for convincing her that Petro America was real, this was not enough to entitle her to severance. "Antagonistic defenses require severance only when there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." Id. at 743 (quotation omitted). Further, "[i]t is not sufficient that one defendant be taking the position that [s]he knew nothing of the crime while asserting that [her] codefendant was involved." Id. (quotation omitted). Here, Brown has failed to persuasively explain how her attempts

-23-

to cast blame on Hawkins caused the jury to "unjustifiably infer" that both were guilty of the crimes charged. Accordingly, Brown was not entitled to severance.

Brown also contends she was prejudiced by the jury's supposed inability to compartmentalize the evidence. "In assessing the jury's ability to compartmentalize the evidence against joint defendants, not only the complexity of the case must be examined, but also whether any of the defendants were acquitted and whether the jury instructions were adequate." United States v. Henley, 766 F.3d 893, 915 (8th Cir. 2014). Brown raises no arguments with respect to the complexity of the evidence or the fact that none of the codefendants were acquitted. She instead contends the district court's failure to explicitly instruct the jury that statements Hawkins made while in his lawyer role were not evidence prevented the jury from understanding which of his statements constituted evidence, and which did not. See United States v. Oglesby, 764 F.2d 1273, 1276 (7th Cir. 1985) (suggesting that district courts provide a similar instruction in joint conspiracy trials where one of the coconspirators is proceeding pro se). Brown also asserts that Hawkins' representation of himself was so poor that the jury "could not compartmentalize Owen Hawkins, the charismatic leader of Petro America [and] Hawkins, the inept pro se defendant."

We find Brown's arguments unpersuasive under the facts before us. The record establishes that at the beginning of trial the district court informed the jury that Hawkins was serving as his own attorney, and it also thoroughly instructed the jury regarding what constituted evidence and the fact that lawyers' statements were not evidence. Further, although Hawkins frequently attempted to testify via the questions he asked witnesses, the government and Hawkins' codefendants invariably objected to his attempts to do so, and the district court sustained virtually all of these objections. In addition, on multiple occasions the district court chastised Hawkins in front of the jury for trying to testify while serving in his lawyer role. Based on this record, it is clear the district court repeatedly clarified to the jury, albeit indirectly, that statements Hawkins made while in his lawyer role were not evidence.

-24-

Accordingly, Brown has not established that the district court's failure to instruct the jury regarding the evidentiary implications of Hawkins' self-representation prevented the jury from compartmentalizing the evidence against the codefendants.

We also reject Brown's contention that she was unfairly prejudiced by the quality of Hawkins' self-representation. The district court implemented numerous safeguards to ensure that Hawkins' codefendants would not be prejudiced by his lack of legal training and trial experience, including warning Hawkins that he would be held to the rules of law and evidence and appointing standby counsel. See Oglesby, 764 F.2d at 1276 (suggesting similar safeguards). The record indicates that, although Hawkins struggled to admit exhibits and sometimes raised improper objections, the district court exercised sufficient control over Hawkins' courtroom conduct to ensure that his codefendants were not unfairly prejudiced by his pro se representation. See Jarrett, 684 F.3d at 804 (holding defendant failed to show that she was prejudiced by codefendant's pro se representation despite evidence that his performance was "ghastly" and "tried the jury's patience."). Brown also suggests she was prejudiced by Hawkins' efforts to prove to the jury that Petro America was a real company with valuable assets because the evidence he offered in support of this claim actually tended to prove the company was a farce. However, as noted above, Hawkins' and Brown's defenses were not irreconcilable, and the district court effectively limited Hawkins to only presenting evidence that was relevant to his defense. Zafiro v. United States, 506 U.S. 534, 540 (1993) (holding that in the context of joint trials, "a fair trial does not include the right to exclude relevant and competent evidence"). Accordingly, we affirm the district court's denial of Brown's motion to sever.

## 2. Roper's Motion to Subpoena Witnesses

Roper contends the district court's denial of his Rule 17(b) motions to subpoena various expert and fact witnesses prevented him from adequately presenting his good faith defense, in violation of his Fifth Amendment right to due process, and also

deprived him of his Sixth Amendment right to compulsory process. Specifically, Roper contends that he needed a securities expert to testify as to whether Petro America made a good faith effort to comply with SEC laws and that he needed geologists to testify about whether the company's mining claims had any value. Roper's argument is meritless. As we have previously noted, "[t]he right to compulsory process is not absolute. Both the Sixth Amendment compulsory process and the Fifth Amendment due process clauses require that a defendant show that the witness 'testimony would have been both material and favorable to his defense.'" United States v. Luvene, 245 F.3d 651, 654 (8th Cir. 2001) (quoting United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982)).

On appeal, Roper contends that he "was privy to none of the schemes Hawkins attempted with others to secure investors and acquire assets for Petro." Given this contention, we fail to see how witness testimony regarding the value of Petro America's mining claims and other transactions is material to Roper's good faith defense. Furthermore, with regard to Roper's request to subpoena a securities expert, we note that Roper has neither adequately specified the information about which the expert would testify nor established that such information would be favorable to his good faith defense. Id. The record also indicates Roper's counsel effectively presented his good faith defense to the jury via his cross-examination of witnesses, that he had the opportunity to call his own witnesses, and that the district court gave Roper's proffered good faith instruction. United States v. Hang, 75 F.3d 1275, 1282 (8th Cir. 1996) ("The burden is upon [the party requesting a Rule 17(b) subpoena] to show that the desired witnesses are necessary to an adequate defense."). Accordingly, the district court did not err in denying Roper's Rule 17(b) motions.

## B.    Jury Selection

### 1.    Juror Misconduct and Hawkins' Motion for a New Trial

The sole issue Hawkins raises on appeal is that the district court erred by refusing to grant him a new trial on the basis of juror misconduct.[17]  Specifically, Hawkins contends that Juror No. 2's supposed dishonesty about her relationship with Nordquist indicates she was biased against Hawkins and that her inclusion on the jury therefore deprived him of his Sixth Amendment right to be tried and convicted by an impartial jury.  "We review claims of constitutional error de novo."  United States v. Sweeney, 611 F.3d 459, 473 (8th Cir. 2010) (quotation omitted).  Pursuant to our precedent and the framework set forth in McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548 (1984), "a party seeking a new trial on the basis of concealed juror bias must prove three things: (1) that the juror answered dishonestly, not just inaccurately; (2) that the juror was motivated by partiality; and (3) that the true facts, if known, would have supported striking the juror for cause."  United States v. Ruiz, 446 F.3d 762, 770 (8th Cir. 2006).  Findings of fact on a McDonough hearing, including "honesty of the juror and actual bias," are reviewed for clear error.  Id. (quotation omitted).  "The ultimate determination of whether a new trial is required is reviewed for abuse of discretion."  Id. (quotation omitted).

Having closely reviewed the record, we cannot say the district court clearly erred in concluding that Hawkins failed to prove that Juror No. 2 was dishonest about her relationship with Nordquist.  Given that Juror No. 2 freely disclosed that she worked at Hall's and that Nordquist apparently did not recognize her among the

---

[17]Hawkins filed a pro se motion to file a supplemental brief in which he asserted numerous arguments not raised by his counsel on appeal.  Although we agreed to take Hawkins' motion under consideration, "[i]t is not our practice to consider pro se pleadings filed by the parties represented by counsel," and we decline to do so here.  United States v. Mentzos, 462 F.3d 830, 838 n.3 (8th Cir. 2006).

members of the jury, it was reasonable to infer that Juror No. 2 did not lie about her relationship with Nordquist but instead simply did not recognize his name or face. Further, the record contains little, if any, evidence that Juror No. 2 had any reason to lie about her alleged relationship with Nordquist. Accordingly, we affirm the district court's denial of Hawkins' motion for a new trial.

## 2. Batson Challenge

Heurung asserts the district court erred by denying his Batson challenge to the government's peremptory strike of Venireperson No. 28. "A Batson challenge requires a three-step, burden-shifting analysis." United States v. Jones, 245 F.3d 990, 992 (8th Cir. 2001). "First, the opponent of a peremptory strike must make a prima facie case of racial discrimination." Id. "The burden of production then shifts to the proponent of the strike, who must tender a race-neutral explanation." Id. "Finally, if a race-neutral explanation is presented, the trial court must determine whether the opponent of the strike has proven purposeful racial discrimination." Id. Trial courts "play a critical role during a Batson challenge," including "viewing the jurors' demeanor, which can be a race-neutral justification in the exercise of a peremptory challenge." United States v. Young, 753 F.3d 757, 780 (8th Cir. 2014). "These determinations of demeanor . . . are exclusively within the province of the trial court." Id. Reviewing courts will defer to the trial court so long as the record confirms that the juror's demeanor "was a sufficient basis for the peremptory challenge." Id. "We review for clear error the court's ultimate evaluation of whether discriminatory intent motivated the government." Jones, 245 F.3d at 992. Here, the government provided a sufficient race-neutral explanation for striking Venireperson No. 28–that her responses and demeanor while answering the government's questions about her son's prosecution for federal drug offenses indicated that she might be biased against the government and might favor lower-level members of the Petro America conspiracy. The district court agreed that Venireperson No. 28's responses and demeanor suggested that she might struggle to be impartial, and nothing in the record suggests

that this conclusion was clearly erroneous. Accordingly, we affirm the district court's denial of Heurung's <u>Batson</u> challenge.

### C.     Exhibit 1000

Heurung next contends he is entitled to a new trial because he was severely prejudiced by the district court's erroneous admission of Exhibit 1000. "We review a district court's interpretation and application of the rules of evidence de novo and its evidentiary rulings for abuse of discretion." <u>United States v. Campbell</u>, 764 F.3d 880, 887 (8th Cir. 2014) (quotation omitted). We agree the district court erred in admitting the exhibit, but conclude this error was harmless in light of the strength of the government's case against Heurung and the safeguards implemented to minimize the prejudicial effect of the exhibit.

As noted above, Exhibit 1000 outlines the government's evidence against Heurung via summaries of various voluminous records and witness testimony. Rule 1006 of the Federal Rules of Evidence permits a proponent to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed R. Evid. 1006. Such summaries are properly admissible when "(1) the charts fairly summarize voluminous trial evidence; (2) they assist the jury in understanding the testimony already introduced; and (3) the witness who prepared the charts is subject to cross-examination with all documents used to prepare the summary." <u>United States v. Green</u>, 428 F.3d 1131, 1134 (8th Cir. 2005) (internal quotations omitted).

Our precedent also permits parties to use a "pedagogic device," such as a summary of witness testimony and/or trial exhibits, to organize testimony and other evidence for the jury. <u>Bradshaw v. FFE Transp. Servs., Inc.</u>, 715 F.3d 1104, 1109 (8th Cir. 2013); <u>see United States v. Crockett</u>, 49 F.3d 1357, 1361-62 (8th Cir. 1995). Although "we do not encourage the use of" pedagogic devices to summarize evidence

already in the record, Crockett, 49 F.3d at 1362, we have recognized that such devices may assist the jury in understanding the evidence, particularly in cases involving "complex testimony or transactions." Id. at 1361. The use of pedagogic devices is within the sound discretion of the trial court, and our review is limited to "whether the pedagogic device in question was so unfair and misleading as to require a reversal." Id. (internal quotation omitted). Our precedent also suggests, but certainly does not establish, that pedagogic devices may be admitted into evidence. Id. ("Such summaries need not be admitted into evidence, and therefore can be created by counsel for or during closing argument."); United States v. Adejumo, 772 F.3d 513, 524 (8th Cir. 2014) (noting organizational chart that depicted names, photographs and roles of 20 people involved in alleged bank fraud conspiracy may have been admissible had it been supported by proper foundation); see United States v. Milkiewicz, 470 F.3d 390, 398 (1st Cir. 2006) ("In some cases . . . pedagogical devices may be [so] sufficiently accurate and reliable that they, too, are admissible in evidence, even though they do not meet the specific requirements of Rule 1006."); but see United States v. Bray, 139 F.3d 1104, 1112 (6th Cir. 1998) (holding pedagogic devices are inadmissible and requiring courts to instruct jury to that effect).

Because Exhibit 1000 summarizes both admissible voluminous records and witness testimony, it cannot be neatly classified as either a voluminous-records summary or a pedagogical device. The government contends that Rule 1006 alone allows for the full admission of Exhibit 1000. We reject this argument outright. Both the plain language of, and the Advisory Committee notes to, Rule 1006 indicate the rule allows parties to use and/or admit summaries, charts, or calculations to prove the content of otherwise admissible voluminous writings, recordings, or photographs when doing so is the only practicable means of making such contents available to the judge and jury. Fed. R. Evid. 1006. Witness testimony is not a record that falls within the purview of Rule 1006, but by its very nature such testimony consists of content the trial judge deems worthy and practicable of putting before the jury. See

Bray, 139 F.3d at 1112. Accordingly, Exhibit 1000 was not independently admissible under Rule 1006. Id.

The government alternatively suggests that Exhibit 1000 was admissible under Rule 611(a), which gives trial courts control over "the mode [of] presenting evidence." Fed. R. Evid. 611(a). Although our precedent suggests that hybrid devices that summarize both witness testimony and voluminous records may be admissible in unusual cases involving highly "complex testimony or transactions," Crockett, 49 F.3d at 1361, we hold that Exhibit 1000 was inadmissible for two distinct reasons. First, Exhibit 1000 on numerous occasions dramatically and provocatively reframes witness testimony in an argumentative manner,[18] which alone probably renders the summary inadmissible under the principles discussed in Crockett. Id. Further, with respect to the recordings of Heurung's conference calls, which the parties agree constitute voluminous records, Exhibit 1000 regularly labels statements Heurung made during these calls as being "false and misleading," "exaggerations," or "material misrepresentations and omissions *designed* to bolster Petro's stock offering." (Emphasis added.). Although Rule 1006 permits summaries of voluminous records to "include assumptions and conclusions," Green, 428 F.3d at 1134 (quotation omitted), the government's argumentative recasting of Heurung's statements certainly would have rendered the government's summaries of his conference calls inadmissible under this rule. EEOC v. HBE Corp., 135 F.3d 543, 553 (8th Cir. 1998) (holding that exhibit was admissible under Rule 1006 because it

_____

[18]For example, one of the government's witnesses mentioned in passing that she listened to some of Heurung's conference calls, but provided few details regarding the content of the calls. Exhibit 1000, however, stated that the witness listened to Heurung's calls every week and that he kept her "on the hook" because "he was such a good speaker." Further, on various occasions the government inaccurately portrayed witnesses as stating that Heurung was a "slick businessman," that his calls were "mesmerizing," and that during conference calls he proclaimed "shareholders are an elite group of folks, average Joes out there would not understand it."

was "straightforward and accurate, rather than argumentative or conclusory."). The government cannot sidestep Rule 1006 merely by smuggling an argumentative summary of voluminous records into a hybrid exhibit and seeking admission of the exhibit under the banner of Rule 611(a). Accordingly, although the district court was within its discretion to allow Agent Fields to use Exhibit 1000 during his testimony, the court erred by admitting the exhibit into evidence and allowing the jury to use the exhibit during deliberations.

However, having closely reviewed the entire record, we hold that the district court's erroneous admission of Exhibit 1000 was harmless in light of the overwhelming evidence the government offered against Heurung and the safeguards the district court and the parties implemented to minimize the prejudicial effect of this evidence. "An erroneous evidentiary ruling is harmless . . . if it did not have a substantial influence on the jury's verdict." Adejumo, 772 F.3d at 525. The government's evidence demonstrated, among other things, that Heurung was a spokesman for Petro America, that he told shareholders he was privy to Petro America records and knew the company was worth hundreds of billions of dollars and was on the cusp of going public, that he falsely claimed that he brought valuable mining claims to the company, and that he received hundreds of thousands of dollars for pitching Petro America. We further note that Heurung's counsel was given some time to review Exhibit 1000 and request changes, the government apparently accommodated all of the requested changes, Heurung's counsel cross-examined Agent Fields with respect to the exhibit, and the district court expressly instructed the jury that the contents of the exhibit had been challenged and it was up to them to decide what weight, if any, to give the exhibit. Given the strength of this evidence and the safeguards that were implemented to minimize the prejudicial effect of Exhibit 1000's admission, we cannot say that the district court's evidentiary error had "a substantial influence on the jury's verdict." Id.; Cf. United States v. Nguyen, 504 F.3d 561, 572-73 (5th Cir. 2007) (district court's erroneous admission of summary witness testimony was harmless in light of overwhelming evidence the government presented against

defendant and safeguards the court implemented to minimize the prejudicial effect of the exhibit.).  Accordingly, we affirm Heurung's conviction.

### D.    Motions for Judgment of Acquittal

Miller and Roper argue that the district court erred in denying their motions for judgment of acquittal because there was insufficient evidence to support the jury's verdict.  "We review this denial de novo, view[ing] the evidence in the light most favorable to the guilty verdict, [and] granting all reasonable inferences that are supported by that evidence."  United States v. Hansen, No. 14-2188, 2015 WL 3952782, at *3 (8th Cir. June 30, 2015) (alterations in original) (internal quotation omitted).  We must affirm if a reasonable juror could have found the defendant guilty beyond a reasonable doubt.  Id.

As noted above, Roper was charged with conspiracy to commit wire fraud and securities fraud, while Miller was charged with conspiracy to commit wire fraud and securities fraud, wire fraud, and laundering money that was derived from wire fraud. In order to convict a defendant of conspiracy, the government must prove "(1) a conspiracy with an illegal purpose existed; (2) [the defendant] knew of the conspiracy; and (3) [the defendant] knowingly joined and participated in the conspiracy."  United States v. McKanry, 628 F.3d 1010, 1016 (8th Cir. 2011) (quotation omitted).  With respect to the knowledge element, "[a] defendant's willful blindness may serve as the basis for knowledge if, in light of certain obvious facts, reasonable inferences support a finding that a defendant's failure to investigate is equivalent to burying one's head in the sand."  United States v. Chavez-Alvarez, 594 F.3d 1062, 1067 (8th Cir. 2010) (internal quotation omitted).  "Where, as in this case, the government alleges a conspiracy to commit multiple crimes, the charge is sustained by adequate pleadings and proof of conspiracy to commit any one of the offenses."  McKanry, 628 F.3d at 1016 (internal quotation omitted).

The record clearly establishes that Hawkins and others conspired to sell worthless, unregistered Petro America stock to investors by means of fraudulent misrepresentations and omissions, and that the coconspirators frequently used interstate wires to further this scheme. See id. at 1017 (listing elements of wire fraud); 15 U.S.C. § 77q(a) (stating it is unlawful for any person in the offer or sale of securities by the use of any instrument of communication in interstate commerce to employ any device, scheme, or artifice to defraud or to obtain money by means of any untrue statements of material fact or by certain misleading omissions of material fact). It is also undisputed that Miller and Roper personally used interstate wires to offer and to sell Petro America's stock to numerous investors and that they derived substantial profit from their conduct. Miller and Roper challenge their convictions, however, on the grounds that the government's evidence failed to prove that they knew or were willfully blind to the fact that Petro America was a scam.

### 1. Roper

A reasonable jury could have found that Roper's role with Petro America and the means by which he promoted and sold the company's stock suggested that he either knew Petro America was a scam or was willfully blind to this fact. The record indicates that early on in the Petro America scam Roper played an important role in publicly pitching the company to prospective investors. Roper authored the September 20, 2008, email that disseminated misinformation about Petro America to a wide audience. Roper also collected money from investors who responded to his email solicitation, and he admitted to Securities Division officials that he was "very concerned" about the large amount of money that was sent to him. Roper also collected money from investors at early Petro America shareholder meetings and played a role in leading some of these meetings. In addition, various witnesses indicated that Roper was a member of Hawkins' inner circle and that Roper gave the impression that he was high up in the company and had inside knowledge of its affairs. Further, Roper was one of a small number of Hawkins' confidants who

-34-

received free shares and derived a large profit from selling these shares to unwitting investors. Roper's insider role with the company, coupled with the fact that he was one of a small group of people who derived substantial profit from selling worthless shares to investors suggests that he knew Petro America was a scam. See United States v. Ervasti, 201 F.3d 1029, 1037 (8th Cir. 2000) ("Provided the victims suffered some tangible loss–as they did here–[t]he scheme itself often serves as evidence of a defendant's intent to defraud.") (alteration in original) (internal quotation omitted).

The means by which Roper promoted and sold Petro America's stock is also highly suspicious. As noted above, Roper's email made numerous unsubstantiated and grandiose claims about Petro America's value, the company's prospects for going public, and the return investors could expect to make on their investment. The email also failed to state numerous material facts, including that the company's stock was not registered in Missouri or any other jurisdiction, that Roper was not registered to sell the stock, any historical and financial information about Petro America, or the risks of investing with the company. Yet when Securities Division officials questioned Roper about this email, he admitted that he knew Petro America's stock was not registered in Missouri and that he was not registered to sell this stock. Roper further indicated that he had some background in securities law, which suggests he knew the email failed to state material information and that these omissions rendered the email's contents quite misleading.

Any doubts Roper had about the legality his conduct were surely dispelled by the Order, which explicitly stated that his sale of Petro America's stock was unlawful. The record, however, indicates that after the Order was issued, Roper used interstate wires to promote and sell Petro America stock. Roper contends that he tried to follow the Order by not selling any stock to Missouri residents. However, as noted above, Roper regularly indicated to prospective investors that Petro America's stock was or soon would be valuable, yet he failed to disclose numerous material facts about the company, including that he and Petro America were subject to the Order, that the

company's stock was not registered in any jurisdiction, Petro America's financial condition, etc. These factual omissions are highly suspicious for at least two reasons. First, given Roper's background in securities law, he presumably knew that under the circumstances, his factual omissions probably constituted federal securities fraud.[19] 15 U.S.C. 77q(a)(2); SEC v. First Am. Bank & Trust Co., 481 F.2d 673, 679 (8th Cir. 1973) (holding that persons who actively engage in the promotion and sale of securities must disclose material facts and noting that omitted fact is material under § 77q(a) if its disclosure would have influenced a reasonable investor's "choice of action in the transaction in question" (quotation omitted)); see, e.g., United States v. Bessesen, 433 F.2d 861, 864 (8th Cir. 1970) (defendant's failure to disclose that company for which he was selling securities was subject to cease and desist order in another state constituted omission of material fact under § 77q(a)); accord SEC v. Merchant Capital, LLC, 483 F.3d 747, 771-72 (11th Cir. 2007). Second, given Roper's knowledge of the Order and his background in securities law, a reasonable jury could have concluded that Roper intentionally failed to provide material information about the company because he knew that Petro America was a scam and he could not substantiate his assertions regarding the value of the company's securities and its prospects for going public.

Further, even if Roper lacked actual knowledge that Petro America was a scam and that his sale of the company's stock was illegal, "a reasonable juror could have found he was willfully blind to the truth." Hansen, 2015 WL 3952782, at *4. "[T]he two requirements of willful blindness are (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." Id. (internal quotation omitted).

---

[19]As noted above, Roper was not charged with securities fraud. However, his willingness to promote and sell the stock in a manner that he knew probably blatantly violated federal law is circumstantial evidence of his intent to defraud.

"The jury may find willful blindness only if the defendant was aware of facts that put him on notice that criminal activity was probably afoot and deliberately failed to make further inquiries, intending to remain ignorant." Id. at *5 (quotation omitted).

Here, the government offered sufficient evidence that, even if Roper had no actual knowledge that he was selling worthless, unregistered stock, "then this was only because he chose to bury his head in the sand." Id. at *5. Given Roper's familiarity with securities law and the contents of the Order, his run-in with the Securities Division, and the fact that he knew Petro America's securities were not registered in Missouri or any other jurisdiction, Roper surely was aware that his and others' sales of the company's stock probably were illegal. Nonetheless, the record indicates he sold his stock on numerous occasions without taking any reasonable steps to verify whether it was legal for him to do so. It is also telling that Roper's stock sales were unaffected by his knowledge that federal officials had executed a criminal search warrant at Brown's home and that Hawkins had been arrested on federal fraud charges. Finally, although Roper indicated to some prospective investors that he had performed due diligence on Petro America's asset values and the company's prospects for going public (e.g., the September 20, 2008, email), he apparently relied on Hawkins' assertions regarding these matters and never took any reasonable steps to determine whether the company was legitimate. See United States v. Sigillito, 759 F.3d 913, 939-40 (8th Cir. 2014). On the whole, we find the evidence was sufficient for a reasonable juror to conclude that Roper "knew of the [Petro America conspiracy and] knowingly joined and participated in the conspiracy." McKanry, 628 F.3d at 1016. Accordingly, his conspiracy conviction must stand.

## 2. Miller

We also hold the government's evidence was sufficient to support Miller's conviction. Miller was close friends with Hawkins long before he started Petro America and therefore presumably knew that Hawkins had little experience in the

business world and certainly had never built or run a large corporation, much less one that was worth hundreds of billions of dollars. Further, the record indicates that Miller was part of Hawkins' inner circle at Petro America and knew that Hawkins was the company's only employee. In light of this evidence alone, a reasonable jury could have rejected Miller's claim that he truly believed that Hawkins, a stock neophyte with little to no experience in the corporate world, built a $284 billion business juggernaut essentially by himself in two years' time. Ervasti, 201 F.3d at 1037.

The circumstances under which Miller sold his stock are also relevant to his intent to defraud. The record indicates that, although Miller read the Order, he blatantly violated it on numerous occasions by selling unregistered Petro America securities in Missouri. Miller contends that Hawkins assured him that he could sell his shares, but this explanation seems disingenuous in light of the fact that the Order expressly identified that Petro America's securities could not be sold in Missouri until they were registered, became federally covered, or qualified for an exemption. Given that Miller presented no persuasive evidence that he was told or believed that Petro America fit any of these criteria, the jury reasonably could have rejected his contention that he believed he could legally sell his shares in Missouri. Id. Further, Miller has provided no persuasive explanation regarding why he never disclosed to prospective investors any information about the Order, that Petro America's stock was not registered, that he was not registered to sell the company's stock, the company's financial information, or the risks associated with investing in the company. See Mo. Rev. Stat. Ann. §§ 409.1-102, 409.3-301, 409.4-401, and § 5-501(2). The record also contains evidence that Miller lied to Agent Fields about his stock sales and was evasive when pressed regarding how much money he made from these sales. This evidence, when coupled with Miller's close relationship with Hawkins and his insider status at Petro America, suggests that Miller knew the company was a scam and that his and others' sale of the company's stock was illegal.

We further note the government presented substantial evidence that Miller, like Roper, turned a blind eye to obvious warning signs that Petro America was a scam. Although Miller read the Order and represented to other shareholders that it had been resolved, there is no evidence that he took any reasonable steps to determine whether the Order remained in effect or how it applied to his own stock sales. Sigillito, 759 F.3d at 939-40. The record further indicates that in February 2010, Miller asked his financial advisor, Michael Martin, to deposit his shares with a national custodian firm in anticipation of Petro America going public. However, Martin quickly returned the shares to Miller after Martin researched Petro America on the internet and concluded that the company's securities were worthless. Martin further testified that he told Miller, in person and in writing, that his shares with Petro America had no value and that Petro America was "too good to be true." Martin further testified he did not believe that Miller could legally sell his shares in Missouri, that he would have been surprised if Miller had sold shares after their meeting, and that if Miller had sold shares this would have indicated "he wasn't as naive about the shares as I thought perhaps he was." Nonetheless, the record indicates that after his meeting with Martin, Miller sold his shares to multiple people and perhaps even escalated his efforts to sell his shares. Miller also continued to sell shares even after the government searched Brown's home and he cashed at least one investor's check after Hawkins was arrested on federal fraud charges. Miller also indicated to Agent Fields that he began to question Petro America's legitimacy after learning that the company's corporate headquarters was actually a Regus virtual office. On the whole, this evidence suggests that, although Miller, at a minimum, harbored doubts about Petro America and was exposed to numerous red flags indicating the company might be a scam, he buried his head in the sand and continued to reap substantial profits from selling the company's stock to unwitting investors.[20] Accordingly, the evidence was sufficient to support Miller's conspiracy conviction.

---

[20]Based on this conclusion, we also hold the district court did not abuse its discretion in giving the willful blindness instruction to the jury. Hansen, 2015 WL 3952782, at *5.

We also hold the government's evidence was sufficient to support Miller's conviction for wire fraud and money laundering. Both convictions arose from Miller's use of interstate wires to offer and sell $30,000 worth of stock to another Petro America shareholder. Miller contends the government failed to prove a fundamental element of the wire fraud charge–that he voluntarily participated in a scheme to defraud. However, as noted above, the government's evidence proved that Miller knowingly and voluntarily participated in a scheme to sell worthless, unregistered Petro America stock to others. It is also clear that Miller's stock sale to one particular shareholder falls within the purview of the Petro America conspiracy and that he used most or all of the proceeds derived from this sale to purchase a truck. Accordingly, Miller's challenges to the sufficiency of the evidence supporting his wire fraud and money laundering convictions must fail. Hansen, 2015 WL 3952782, at *5-6.

### E.    Heurung's Sentencing Challenges

Heurung challenges his sentence on the grounds that the district court erred in applying a manager/supervisor enhancement and in its loss calculations. "The district court's factual findings, including its determination of a defendant's role in the offense, are reviewed for clear error, while its application of the [G]uidelines to the facts is reviewed de novo." United States v. Gaines, 639 F.3d 423, 427-28 (8th Cir. 2011) (quotation omitted).

### 1.    Manager/Supervisor Enhancement

The district court did not clearly err in finding that Heurung was a manager or supervisor of the Petro America conspiracy. Section 3B1.1(b) of the United States Sentencing Guidelines (U.S.S.G.) provides that "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or

more participants or was otherwise extensive, increase by 3 levels."[21] U.S.S.G. § 3B1.1(b). "The government must prove the enhancement by a preponderance of the evidence." United States v. Moreno, 679 F.3d 1003, 1004 (8th Cir. 2012).

Heurung contends the district court should not have applied the manager/supervisor enhancement because there was no evidence that he exercised control over another participant. However, as we held in Gaines, our rule is that proof of a defendant's control over another participant is sufficient, but not necessary, to sustain a manager/supervisor enhancement. 639 F.3d at 428-29 n.4. Rather, Gaines clarifies that sentencing courts may also consider additional factors including, inter alia, the nature and scope of the illegal activity, the degree of participation the defendant had in planning or organizing the offense, and the exercise of decision-making authority. Id. at 428-29 (citing U.S.S.G. § 3B1.1 cmt. n.4). Here, the district court was presented with substantial evidence that over the course of two years Heurung pitched Petro America to thousands of unwitting investors, many of whom purchased stock from Heurung's coconspirators. Further, as noted above, Heurung negotiated and signed "contracts" on behalf of Petro America and then publicly claimed via conference calls that these contracts brought billions of dollars to the company. Heurung also participated in closed-door meetings with other Petro America leaders and organized and hosted a cruise for Petro America shareholders. In sum, the record indicates Heurung exercised a high level of decision-making authority over some of the conspiracy's essential functions and that his tenacious promotion of the company's stock set up his coconspirators' illegal sale of worthless stock to investors. Under our precedent, this evidence is sufficient to support the district court's application of a manager/supervisor enhancement. Id.

---

[21]It is beyond dispute that the Petro America conspiracy was very extensive and involved five or more participants.

## 2.       Loss Calculations

Heurung raises two separate arguments with respect to the district court's loss calculations.  He first contends the district court failed to make individualized findings regarding the scope of the criminal activity he undertook and whether the acts and omissions of his coconspirators were foreseeable to him.  See U.S.S.G. § 1B1.3(a)(1) (stating that "in the case of jointly undertaken criminal activity . . . undertaken by the defendant in concert with others," the defendant is responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity").  Heurung also contends the district court erred by holding him liable for acts and omissions of his coconspirators that occurred before he joined the conspiracy.  U.S.S.G. § 1B1.3 cmt. n.2 ("A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant's joining the conspiracy, even if the defendant knows of that conduct.").

Heurung's arguments are unpersuasive.  The record indicates the district court carefully considered evidence of Heurung's involvement in the conspiracy and determined Heurung had an important managerial role in Petro America that included, inter alia, disseminating misinformation about the company to thousands of people for the purpose of persuading them to purchase the company's stock from his coconspirators.  The district court thus concluded, quite reasonably, that the stock sales of Heurung's coconspirators were foreseeable to Heurung.  In addition, the record contains evidence that Heurung joined the conspiracy at or near the time that Hawkins and his coconspirators began selling stock.  The district court therefore did not clearly err in attributing to Heurung the entire loss caused by the Petro America scam.  United States v. Hartstein, 500 F.3d 790, 795 (8th Cir. 2007) (holding "the sentencing court need only make a reasonable estimate of the loss") (internal quotation omitted).

## III.   CONCLUSION

For the foregoing reasons, we affirm the defendants' convictions and Heurung's sentence.

_____